2024 IL App (4th) 240751

NOS. 4-24-0751 & 4-24-0752 cons.

FILED
September 18, 2024
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* D.V. and M.V., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | Nos. 23JA124 |
| v. | ) | 23JA125 |
| Sierra V., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Timothy J. Cusack, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Presiding Justice Cavanagh and Justice Doherty concurred in the judgment and
opinion.

**OPINION**

¶ 1        Respondent, Sierra V., appeals an order entered on April 18, 2024, that (1) found
she remained dispositionally unfit as a parent to D.V. and M.V., (2) continued the minors' father,
Cameron V., as the guardian and custodian, (3) terminated the minors' wardship, and (4) closed
the case. We reverse and remand for further proceedings with directions.

¶ 2                                I. BACKGROUND

¶ 3        On July 13, 2023, the State filed petitions to adjudicate D.V. (age three) and M.V.
(age five) wards of the court and to place them in shelter care based on an environment injurious
to their welfare. The State alleged as follows. Respondent and Cameron had separate residences.
On or about June 3, 2023, the Illinois Department of Children and Family Services (DCFS) was
notified that respondent lived in unsafe conditions with the minors in that "there were sewage

issues in the home," respondent was an alcoholic, and she used cocaine. On or about June 8, 2023, the following occurred:

(1) A DCFS investigator contacted respondent at her home, and the minors were present.

(2) The investigator learned that, because respondent's electricity was disconnected, she arranged for the minors to be with Cameron on Mondays through Wednesdays, when Cameron was not working.

(3) The investigator learned that respondent had custody of the minors during the evenings on Thursday through Sunday, and the minors stayed with respondent's mother during those days.

(4) The investigator observed respondent pour the remainder of an alcoholic beverage into the kitchen sink.

(5) When asked to submit to testing for drugs and alcohol, respondent began to cry and stated she used cocaine the previous week.

(6) The results of the initial oral drug test were inconclusive, and respondent "agreed to submit to three drug drops and cooperate with intact services."

(7) Respondent agreed that, because her home had no electricity, the minors would live with her mother.

(8) The investigator observed that the sewage issue in respondent's home was resolved.

On or about June 10, 2023, respondent informed DCFS that her electricity was turned back on and that the minors were residing at her mother's home and at Cameron's home. On or about June 13, 2023, respondent took a test that was negative for both drugs and alcohol. On or about June 28,

2023, respondent took another test that was negative for both drugs and alcohol. When respondent was to take another drug test on July 10, 2023, she informed the investigator she had used cocaine two days earlier. On July 10, 2023, DCFS also learned that respondent's June 28 test was positive for cocaine and alcohol. (It is not clear from the State's neglect petition whether there was a typo with respect to the date of this positive test or whether the June 28 sample was tested twice with different results.) On or about July 11, 2023, DCFS took protective custody of the minors and placed them with Cameron.

¶ 4                                    A. Shelter Care Hearing

¶ 5             On July 13, 2023, the trial court, Judge David Brown presiding, entered an order transferring temporary custody of the minors to Cameron. The court ordered that respondent would have supervised visitation with the minors. The court directed respondent and Cameron to "cooperate with intact services." The record on appeal does not contain a transcript of the July 13, 2023, proceedings.

¶ 6                                 B. Adjudication and Disposition

¶ 7             On August 24, 2023, respondent filed an answer to the neglect petition. Although she neither admitted nor denied the allegations, she stipulated the State could prove them. On September 7, 2023, Cameron filed a similar answer to the neglect petition.

¶ 8             In advance of the adjudicatory hearing and dispositional hearing, Children's Home Association of Illinois (CHAI) submitted a report to the trial court indicating as follows. Cameron, who was employed full-time, resided with his paramour and the minors in a home that was determined to be safe. Neither Cameron nor the minors were being asked to engage in any services. Respondent was unemployed due to recently completing inpatient rehabilitation for substance abuse. Following that treatment, respondent was referred to counseling "as additional support for

her sobriety and mental health," but those sessions had not yet started. Respondent was also scheduled to attend parenting classes, therapy, and a psychiatry appointment. At one point, respondent was referred for domestic violence classes, but that recommendation was rescinded. Respondent had visits with the minors that were supervised by Cameron. CHAI had not yet been to respondent's home. Respondent was cooperative and in consistent communication with the caseworker. She had taken two drug and alcohol tests; the results of the first test were negative, and the results were pending for the second test.

¶ 9        On September 28, 2023, Judge Brown held the adjudicatory hearing. The State proffered that a DCFS worker would testify consistently with the neglect petition. Respondent's counsel indicated she had no objection to the prosecutor's request for the trial court to find the State had proved the neglect petition by a preponderance of the evidence. The court adjudicated the minors neglected.

¶ 10        The trial court immediately proceeded to the dispositional hearing. Although not called as a witness, the caseworker conveyed the following information to the court. Respondent was scheduled to complete a parenting class later that day. "Grandma" (presumably respondent's mother) had also been cleared to supervise visits between the minors and respondent. Respondent completed inpatient rehabilitation.

¶ 11        Respondent then testified she attended 39 days of inpatient rehabilitation in Springfield for "severe" cocaine and alcohol usage, and she was released on August 21, 2023. During that treatment, she started medication to assist with anxiety and depression, and she learned techniques to manage anxiety. She was now 75 days sober, and this was "the first time" she had been sober that long. She recently started daily medications to control cravings, which helped her tremendously. She was not yet directed to participate in any specific outpatient addiction services.

¶ 12　　　　Cameron testified he was supervising visits between the minors and respondent. He had no concerns about the way respondent interacted with the minors, and visits were going well. Cameron testified he and respondent had the ability to coparent. Asked whether he resented respondent for "dragging" him into this case, he responded, "Not really," adding that it was just something they would have to get through. Before DCFS became involved, Cameron was not "100 percent" aware of how much respondent was struggling. According to Cameron, D.V. was too young to understand what was going on. However, Cameron felt M.V. understood things and harbored emotions she did not talk about. Cameron had discussed with respondent that when this case concluded they "would like to go and get a proper joint custody" order and "get everything finalized."

¶ 13　　　　The prosecutor requested the trial court to make the minors wards of the court and to place guardianship and custody with Cameron. The prosecutor argued that, although respondent had made progress, she was unfit and needed "at least four to five months" of additional sobriety before "we interject some children into this." The prosecutor suggested respondent should participate in parenting classes, counseling, weekly drug tests, and any additional services recommended by the integrated assessment. Although the prosecutor believed Cameron was a fit parent and did not need services, the prosecutor submitted "he should have stepped up sooner" because "[t]he way mom was living with these kids is just horrific."

¶ 14　　　　Cameron's counsel and the guardian *ad litem* (GAL) essentially agreed with the prosecutor's recommendations. The GAL recognized it was "not typical" for a parent to do as much as respondent had done so early in a case and that respondent was "off to a really good start." The GAL mentioned the positive things that were going on with this family, including Cameron's report that respondent had "a very good relationship with the kids."

¶ 15    Respondent's counsel agreed respondent should participate in the services identified by the prosecutor. Although respondent's counsel proposed the trial court "could find" respondent fit today, counsel acknowledged respondent had only been sober for a relatively brief period.

¶ 16    The trial court found it was in the minors' best interests to make them wards of the court. The court found respondent "unfit based upon the contents of the petition" but recognized she was making "monumental strides." The court determined Cameron was fit and agreed with the service recommendations identified by the prosecutor. The court designated Cameron as the minors' guardian and custodian and ordered respondent to have supervised visitation. The court continued the case to March 7, 2024, for the first permanency reviewing hearing. (This hearing was subsequently rescheduled to March 14, 2024.)

¶ 17                    C. First Permanency Review Hearing

¶ 18    CHAI submitted a report to the trial court in advance of the first permanency review hearing, indicating as follows. Cameron and his paramour were in the process of moving into a larger home. Cameron was cooperative with the caseworker and still required no services. Respondent was employed at Taco John's and was "working on getting her home fixed up." She completed parenting classes. Although not asked to engage in services for domestic violence, respondent also voluntarily completed a class "due to past domestic violence" issues. Respondent met weekly with a substance abuse therapist and was reportedly "doing very well." However, respondent failed to appear for a drug test on December 20, 2023, and she tested positive for cocaine on January 29, 2024. Respondent was cooperative with the caseworker and had supervised visitation with the minors. The report raised no concerns about respondent's interactions with the minors, and the caseworker discerned that M.V. "enjoys seeing" respondent.

¶ 19     Respondent's substance abuse therapist also submitted a report in advance of the first permanency review hearing, asserting as follows. Respondent had attended 10 out of 11 sessions, with 1 session missed and rescheduled due to respondent being ill. Respondent had made significant progress toward her goals of not relapsing and managing cravings. She was also implementing coping skills and changing her routine and home to reduce triggers. Respondent used cocaine once in January with a friend "who was also early in recovery," causing respondent to feel " 'immediate regret and shame.' " Respondent started attending 12-step meetings in December 2023 and intended to go more frequently. Respondent began studying for the General Education Development (GED) test.

¶ 20     On March 14, 2024, the trial court, Judge Timothy Cusack presiding, held the first permanency review hearing. The caseworker represented to the court that she had not observed respondent's home. Respondent told the court she made significant alterations to her home and that it was habitable. The caseworker told the court she would go to respondent's home the next day. The caseworker indicated that respondent tested positive once for cocaine on January 29, 2024, but had subsequently always tested negative. The court responded: "Well, let's see what kind of shape the house is in and then we'll go from there." Respondent told the court she knew where she messed up and went wrong and that she was working with her drug counselor every week on it. The court advised respondent she would have to "cold turkey it" and "stack a number of negative drops" for things to change with respect to this case.

¶ 21     Respondent's counsel requested for respondent to have overnight visits with the minors—either at her mother's home (supervised by her mother) or at her own home (supervised by her fiancé). (This was the first mention in the record of respondent having a partner.) Respondent indicated she had been engaged to her fiancé for over a year. The caseworker said she

did not recall any concerns about respondent's fiancé from a background check that was done "a while" ago. The trial court asked whether anybody had concerns about respondent having supervised overnight visits with the minors at her mother's house. The prosecutor suggested to table that issue until the next court date, pending (1) an observation of respondent's home, (2) respondent taking additional drug tests, and (3) a background check on respondent's fiancé. Respondent's counsel had no objection to the prosecutor's suggestion.

¶ 22 The trial court ruled that the caseworker would have discretion to allow respondent to have supervised overnight visits with the minors at her mother's house. The caseworker asked the court to include language about overnight visits in the written order, as her "boss will say no to overnight visits" unless respondent was deemed fit by the court. The court asked the caseworker whether she was "leaning toward" allowing respondent to have overnight visits. The caseworker responded she was "comfortable with them." The court said it understood that DCFS might have a policy against allowing supervised overnight visits for unfit parents. The court suggested the parties should put in the written order that respondent was fit "for supervised visitation purposes only."

¶ 23 Although the trial court determined respondent had not yet regained her fitness "due to the drops," the court made a finding that respondent was "fit *** to be a part of" overnight visits. The court ordered the caseworker to conduct a background check on respondent's fiancé and to observe respondent's home. The court set the matter for another permanency review hearing on April 18, 2024.

¶ 24 The trial court's written order entered on March 14, 2024, added that the permanency goal was to "remain home" and that such goal had not been achieved.

¶ 25 D. Second Permanency Review Hearing

- 8 -

¶ 26     CHAI submitted a report in advance of the second permanency review hearing, asserting as follows. Respondent was still employed at Taco John's. She continued to be "proactive in ensuring that she is doing what she needs to do in order to see her children and keep them safe." The caseworker observed respondent's home, and there were "no environmental hazards." On March 15, 2024, respondent failed to appear for a scheduled drug test, purportedly because she was at a doctor's appointment with D.V. and forgot to call the caseworker. Respondent's other recent drug tests were either negative or pending analysis. The caseworker was unable to obtain information about respondent's fiancé for an updated background check, as respondent separated from him. According to the report, respondent represented that "she is not seeing anyone and that she plans to stay focused on work and her children at this time." M.V. continued to enjoy seeing respondent and expressed no concerns about respondent to the caseworker. CHAI recommended for the case to remain open so the trial court could monitor respondent's progress once the minors began unsupervised visits with her and started staying in her home. CHAI proposed "[a] shortened review period of 2-3 months."

¶ 27     Respondent's substance abuse therapist also submitted a report in advance of the second permanency review hearing, asserting as follows. Respondent attended one out of four recent sessions. "She was sick for part of that time and consistently communicated with this clinician about that fact." Respondent had " 'a lot going on' " and was "open to recommitting to her therapy." The substance abuse therapist wrote that respondent experienced some unspecified "recent trauma that could explain the recent struggle to stay focused." Respondent continued to test negative for drugs and wanted to "focus on personal growth and her continued sobriety."

¶ 28     Judge Cusack conducted the second permanency review hearing on April 18, 2024. At the beginning of the hearing, respondent's counsel asked: "If this closed out today with mom

unfit and the kids remaining home with father, are there services that will still be available for [respondent]?" The caseworker replied:

> "Not with the agency but I can give her like sources of, resources of places to go but not—I mean, we do keep our case open, but if the Court closes out and then we walk out and mom says I want to be done, then we would have to close the case on our end as well."

Respondent's counsel asked the caseworker whether she thought respondent "meets minimal parenting." The caseworker responded in the affirmative. The trial court asked the caseworker, "Isn't there like six months worth of services after closure of the case?" The caseworker replied:

> "So we can keep the case open up to six months, eight months, whatever, but our program is a voluntary program. If the Court closes and then we walk out and mom is like I just want to be done, I don't want to do this anymore, then we would have no other option but to close it."

The caseworker confirmed that services would still be available to respondent if she wanted them, even if the court closed the case.

¶ 29    The prosecutor made the following recommendations:

> "Judge, I would ask that dad remain guardian/custodian. I would strongly disagree that mom is fit in any shape or form. I mean, she's chosen to have this particular boyfriend. She's chosen to use substances. That is not a safe environment for any child especially this late stage in the game. I would ask that dad remain guardian/custodian, mother to remain unfit. If the Court wishes to retain jurisdiction after closing, I would have no, obviously, no problem with that, but I would ask

that wardship be terminated, case closes. There is no reason that dad needs to keep coming back for this. Kids are safe and happy."

Cameron's counsel likewise recommended wardship should be terminated and the case closed. Respondent's counsel requested the court to find respondent fit. If the court disagreed and chose to close the case, respondent's counsel requested for the court to "retain jurisdiction over" respondent's fitness. The GAL recommended to close the case, for Cameron to have custody and guardianship of the minors, and for the court to "retain jurisdiction over" respondent. The GAL reasoned that "[p]ermanency has been achieved" and respondent was making efforts but not progress. On that point, the GAL mentioned unspecified "concerns about" respondent's paramour, a positive drug test in January, and the two failures to appear for drug tests.

¶ 30      The trial court found that the agency, Cameron, and respondent all made reasonable efforts. However, respondent's "progress isn't necessarily matching up," and the minors "have achieved permanency at this stage with the dad in his home." The court closed the case, with Cameron "maintaining guardianship and custody over" the minors. At this point in the ruling, respondent asked the court whether she could see the minors. Rather than directly answering respondent's question, the court recommended she continue to work with the agency to do services. The court recognized respondent had "done a lot of these things" but added that she needed to "implement them." The court said it would "retain jurisdiction over this." Thus, respondent could "petition the Court again for [her] fitness to be returned" if she maintained sobriety for "a time." The court also suggested that respondent needed to distance herself "from all the people that aren't appropriate for [her] children to be around and probably wouldn't work out in [her] best interest." The court explained that, although respondent remained unfit at this point and the children would be in Cameron's custody, respondent could "repetition" the court.

The court said this was a final order regarding the disposition of the minors, giving rise to the right for respondent to appeal.

¶ 31 Cameron then asked the trial court whether respondent was allowed to see the minors. The court told Cameron that was up to him and he needed to speak with his attorney about it, because "[g]enerally speaking, an unfit parent is not allowed to have contact with the children." The court added that Cameron "need[ed] to be careful in that sense until [respondent] gets her fitness restored."

¶ 32 The written order entered on April 18, 2024, reflected the trial court's oral ruling. The order indicated the permanency goal to "remain home with father" had been achieved. The court marked a box in the form order that stated "[t]he minor is in a stable, permanent placement with a suitable guardian, and continued monitoring by the court will not further the health, safety or best interest of the minor." Beside that box, there was additional typing in bold that said "MINORS RESIDE WITH FATHER."

¶ 33 On May 7, 2024, respondent filed a notice of appeal from the order entered on April 18, 2024. The minors' cases were given separate appellate court docket numbers, and we consolidated those appeals.

¶ 34                                      II. ANALYSIS

¶ 35 On appeal, respondent first argues the trial court erred by not restoring her parental fitness on April 18, 2024. Respondent emphasizes she obtained employment, completed a parenting class, made progress in drug counseling, tested positive for drugs only once, voluntarily completed a domestic violence class, and made her home safe. According to respondent, the court erroneously determined she was unfit "on the basis of speculation and conjecture as to her

relationship with a former acquaintance/paramour and the remote possibility that she had not fully recovered from her substance abuse problem."

¶ 36 For her second issue, respondent maintains the trial court improperly terminated wardship of the minors and granted sole guardianship to Cameron. The gravamen of respondent's argument is that (1) she made reasonable progress toward the return of the minors and (2) it was not in the minors' best interests to terminate wardship less than seven months after adjudication. Respondent further contends the court terminated wardship without expressly considering the interests of the public, as required by section 2-31(2) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-31(2) (West 2022)). Respondent proposes this error requires remanding the case for "further proceedings consistent with the Act." However, according to respondent, even had the court made the requisite statutory finding, such finding would have been against the manifest weight of the evidence. She reasons that the court prematurely terminated wardship without giving her the opportunities to complete services and to pursue custody and joint guardianship of the minors.

¶ 37 In response, the State argues the trial court properly found respondent remained dispositionally unfit on April 18, 2024, as she failed to appear for "numerous" drug tests and failed one test. Under such circumstances, the State submits the court was justified in believing the minors could not return to respondent's home soon, which is the hallmark of reasonable progress. Furthermore, the State proposes the court properly terminated wardship and determined permanency had been achieved with Cameron. On that point, the State reiterates its contention that respondent failed to make reasonable progress, whereas Cameron "maintained his fitness" and provided a safe environment for the minors throughout the life of the case. The State also argues the court's findings complied with the requirements of section 2-31(2) of the Act. Nevertheless,

the State acknowledges the court erroneously believed it retained jurisdiction over any aspect of this case, as its jurisdiction lapsed once it terminated wardship and closed the case.

¶ 38                                    A. Jurisdiction

¶ 39        As an initial matter, we confirm our jurisdiction to hear this appeal. Illinois Supreme Court Rule 660(b) (eff. Oct. 1, 2001) provides that appeals from final judgments in juvenile neglect cases are governed by the rules pertaining to civil cases. Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017) authorize appeals from final judgments in civil cases. Here, on April 18, 2024, the trial court terminated wardship and closed the case while continuing the existing guardianship and custody arrangements. See 705 ILCS 405/2-31(2) (West 2022) (authorizing a court to terminate wardship and close a case, with or without continuing the existing guardianship and custody arrangements). An order terminating wardship is a final and appealable order. See *In re M.M.*, 337 Ill. App. 3d 764, 777 (2003) ("[W]e hold that an order closing the juvenile proceedings under section 2-31(2) [of the Act] is a final judgment for purposes of Rule 301 whether or not guardianship has been ordered."). The April 18, 2024, order was final and appealable, as it definitively resolved all matters pending before the court. See *In re Haley D.*, 2011 IL 110886, ¶ 61 ("To be final, an order or judgment must terminate the litigation between the parties on the merits or dispose of the rights of the parties, either on the entire controversy or a separate part thereof.").

¶ 40        Despite recognizing the finality of the April 18, 2024, order, the trial court purported to retain jurisdiction with respect to the issue of respondent's parental fitness. The court's stated intent was to give respondent the opportunity to petition to modify this final order— at some unspecified time—if her personal circumstances changed and she maintained sobriety. However, a juvenile court may not modify a dispositional determination unless the minor is a ward

- 14 -

of the court. See *In re M.G.*, 2018 IL App (3d) 170591, ¶ 15 ("Dispositional decisions, such as findings of unfitness and determinations of guardianship, are statutorily predicated upon the court first making the minors wards of the court. [Citation.] Thus, any such orders entered without a wardship are void."). Moreover, "an order of guardianship *** ceases to be modifiable where the juvenile case has been closed pursuant to section 2-31(2)." *M.M.*, 337 Ill. App. 3d at 775.

¶ 41 Once 30 days pass without a party filing a postjudgment motion challenging an order terminating wardship and closing the case, a party has limited avenues to bring his or her cause back before the juvenile court. Within one year of the judgment, a party may petition to vacate the judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2022)). 705 ILCS 405/2-32 (West 2022). However, section 2-1401 would be of no use to respondent under the circumstances of this case, as that statute would not allow her to challenge the April 18, 2024, judgment based on her progress after that judgment was entered. See *People ex rel. Devine v. Stralka*, 226 Ill. 2d 445, 457 (2007) (explaining that "relief from a final judgment cannot be based on evidence that did not exist at the time of the judgment," such as a petitioner's good behavior after the judgment was entered); *In re Charles S.*, 83 Ill. App. 3d 515, 517 (1980) (noting that "[t]he purpose of a motion under [the statutory predecessor to section 2-1401 of the Code] is to bring before the trial court facts not appearing in the record which, if known to the court and petitioner at the time judgment was entered, would have prevented its entry").

¶ 42 Apart from vacating a judgment pursuant to section 2-1401 of the Code, a trial court may reinstate wardship only in limited circumstances. One circumstance is identified in section 2-33(1) of the Act (705 ILCS 405/2-33(1) (West 2022)):

"(1) Any time prior to a minor's 18th birthday, pursuant to a supplemental petition filed under this Section, the court may reinstate wardship and open a previously closed case when:

(a) wardship and guardianship under the [Act] was vacated in conjunction with the appointment of a private guardian under the Probate Act of 1975;

(b) the minor is not presently a ward of the court under Article II of this Act nor is there a petition for adjudication of wardship pending on behalf of the minor; and

(c) it is in the minor's best interest that wardship be reinstated."

Here, the trial court would lack authority to reinstate wardship pursuant to section 2-33(1) of the Act, as the court never appointed a private guardian for the minors pursuant to the Probate Act of 1975 (755 ILCS 5/1-1 *et seq.* (West 2022)). See *In re L.W.*, 2018 IL App (3d) 170405, ¶ 18 (noting that all three conditions of section 2-33(1) must be met to justify reinstating wardship); *In re Tr. O.*, 362 Ill. App. 3d 860, 866 (2005) (same).

¶ 43　　　　The other circumstances for reinstating wardship are identified in section 2-33(2) of the Act (705 ILCS 405/2-33(2) (West 2022)):

"(2) Any time prior to a minor's 21st birthday, pursuant to a supplemental petition filed under this Section, the court may reinstate wardship and open a previously closed case when:

(a) wardship and guardianship under this Act was vacated pursuant to:

- 16 -

(i) an order entered under subsection (2) of Section 2-31 in the case of a minor over the age of 18;

(ii) closure of a case under subsection (2) of Section 2-31 in the case of a minor under the age of 18 who has been partially or completely emancipated in accordance with the Emancipation of Minors Act; or

(iii) an order entered under subsection (3) of Section 2-31 based on the minor's attaining the age of 19 years before the effective date of this amendatory Act of the 101st General Assembly;

(b) the minor is not presently a ward of the court under Article II of this Act nor is there a petition for adjudication of wardship pending on behalf of the minor; and

(c) it is in the minor's best interest that wardship be reinstated."

Here, none of the conditions of subsection (a) of this statute apply, as the minors were under 18 and unemancipated when the trial court terminated wardship and closed the case. Thus, the court would lack authority to reinstate wardship pursuant to section 2-33(2) of the Act.

¶ 44 The trial court's stated purpose in retaining jurisdiction was to allow respondent to petition the court to modify the April 18, 2024, final order if her circumstances changed. However, we are aware of no statute that would authorize respondent to pursue such relief. We recognize that, in *Tr. O.*, the Second District seemingly suggested a trial court could circumvent the requirements of section 2-33 of the Act by retaining jurisdiction when it closes a case. See *Tr. O.*, 362 Ill. App. 3d at 866-69 (explaining that, although a respondent's petition to reinstate wardship

- 17 -

did not meet the requirements of section 2-33 of the Act, the trial court had retained jurisdiction to modify the order closing the case). Notably, the Second District did not identify any statutory basis for a circuit court to retain jurisdiction in this manner. See *Devine*, 226 Ill. 2d at 454 ("[A] court exercising jurisdiction over a minor pursuant to the provisions of the Act is not at liberty to reject or embellish its statutory authority even if there is a perceived need or desirability for such action.").

¶ 45    So far as the record reflects, there is nothing pending in the circuit court. The trial court resolved all claims on April 18, 2024. We determine we have jurisdiction of this appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017).

¶ 46                    B. Whether the Trial Court Made the Necessary

Statutory Finding to Terminate Wardship

¶ 47    We next address respondent's contention that the trial court failed to make the requisite statutory finding to terminate wardship. We review this issue *de novo*. *M.G.*, 2018 IL App (3d) 170591, ¶ 20.

¶ 48    Section 2-31(2) of the Act provides, in relevant portion:

> "Whenever the court determines, and makes written factual findings, that health, safety, and the best interests of the minor *and the public* no longer require the wardship of the court, the court shall order the wardship terminated and all proceedings under this Act respecting that minor finally closed and discharged." (Emphasis added.) 705 ILCS 405/2-31(2) (West 2022).

Respondent argues the April 18, 2024, order was flawed because the trial court did not use the word "public" in its oral ruling or written order.

¶ 49       Respondent forfeited this point by failing to raise it below. *M.M.*, 337 Ill. App. 3d at 778; *In re K.S.*, 317 Ill. App. 3d 830, 833 (2000). Forfeiture aside, we discern no need to remand the case for further factfinding. Reviewing courts have found compliance with section 2-31(2) even where there was no indication in the appellate opinion that the trial court expressly mentioned the interests of the public when terminating wardship. See *M.G.*, 2018 IL App (3d) 170591, ¶¶ 19-21; *K.S.*, 317 Ill. App. 3d at 833-34. Here, in its oral ruling, the trial court explained it terminated wardship because (1) respondent was making "reasonable efforts but the progress isn't necessarily matching up," (2) the minors had "achieved permanency at this stage with [Cameron] in his home," and (3) respondent remained unfit. The court also reasoned that respondent could file some sort of petition to seek restoration of her fitness. The court reiterated its findings in the written order. The court also marked a box in that form order indicating "[t]he minor is in a stable, permanent placement with a suitable guardian, and continued monitoring by the court will not further the health, safety, or best interest of the minor." Beside that marked box, there is additional typing in bold that says, "MINORS RESIDE WITH FATHER." Under the circumstances, there would be no purpose in remanding the matter for further factfinding. Notably, respondent does not identify any interest the public might have in continuing the minors' wardship that would be different from what the court already addressed. Therefore, we hold that the court's finding in terminating wardship complied with section 2-31(2) of the Act and is conducive to appellate review. With that said, we observe it would be advisable for the court to ensure that its form orders for use in juvenile neglect cases track the statutory language.

¶ 50       C. Whether the Trial Court Abused Its Discretion in Terminating

Wardship and Closing the Case

- 19 -

¶ 51 We now address respondent's contention that the circumstances did not justify terminating wardship and closing the case. As part of her argument, respondent challenges the trial court's factual findings that (1) she remained dispositionally unfit on April 18, 2024 and (2) she did not make reasonable progress toward the return of the minors.

¶ 52 "A trial court's determination to terminate wardship is reviewed under the manifest-weight-of-the-evidence standard when the court's weighing of facts is at issue; otherwise, it is reviewed for abuse of discretion." *In re Aaron R.*, 387 Ill. App. 3d 1130, 1141 (2009). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent." *M.M.*, 337 Ill. App. 3d at 779. "A court abuses its discretion where its decision is 'arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it.' " *In re Joseph J.*, 2020 IL App (1st) 190305, ¶ 26 (quoting *People v. Rivera*, 2013 IL 112467, ¶ 37). "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004).

¶ 53 We hold that *even if* respondent remained dispositionally unfit on April 18, 2024, (1) the trial court's finding that respondent failed to make reasonable progress was against the manifest weight of the evidence and (2) the court abused its discretion by terminating wardship and closing the case.

¶ 54 The minors came into care in July 2023 due to concerns about (1) the safety of respondent's home, (2) her alcohol abuse, and (3) her cocaine abuse. Between July 2023 and April 2024, respondent engaged in required and voluntary services, obtained employment, and started working toward her GED certificate. The record confirms respondent remediated any safety issues in her home, as the caseworker indicated in her last report before the trial court closed the case that there were no environmental hazards in respondent's home. There is no indication in the record

that respondent drank any alcohol after she entered a 39-day inpatient rehabilitation treatment program, which she completed in August 2023. Thus, it is clear respondent made not just reasonable but complete progress toward addressing the first two concerns that brought the case into care.

¶ 55   In defending the trial court's finding of lack of reasonable progress, the State points to respondent's "numerous" missed drug tests. The record contradicts the State's hyperbole, as respondent appeared for 26 tests and missed 2. One of those missed tests was on December 20, 2023, which was almost three months before the first permanency review hearing and almost four months before the second permanency hearing, when the court terminated wardship. Respondent evidently was at the doctor with D.V. when she missed her only other drug test on March 15, 2024. Considering respondent's overall significant progress, missing two weekly drug tests over the course of seven months, one of which was because she was taking her child to the doctor, cannot plausibly be construed as a lack of reasonable progress.

¶ 56   The State also emphasizes that respondent tested positive for cocaine on January 29, 2024. Under the unique circumstances of this case, respondent's lone relapse did not justify a finding on April 18, 2024, that she failed to make reasonable progress. The trial court knew about respondent's relapse at the first permanency review hearing on March 14, 2024. The court also knew from a report submitted by respondent's substance abuse therapist in advance of the first permanency review hearing that respondent felt ashamed by this relapse and was working with her therapist to address it. Notwithstanding the relapse, at the first permanency review hearing, the court authorized respondent to begin supervised overnight visitations with the minors. When the case returned for the second permanency review hearing on April 18, 2024, there was no indication that respondent had any further setbacks, and the caseworker told the court she believed respondent

now met minimal parenting standards. Nevertheless, the court abruptly terminated wardship and closed the case. It is not apparent why the court believed on April 18, 2024, that a single positive drug test from three months earlier—which was known to the court before the first permanency review hearing—suddenly justified a finding that respondent had not made reasonable progress and warranted terminating wardship.

¶ 57 At the April 18, 2024, permanency review hearing, the GAL said there were "still concerns about [respondent's] paramour." The prosecutor similarly commented that respondent had "chosen to have this particular boyfriend." In its ruling, the trial court told respondent she needed to "distance [herself] from all the people that aren't appropriate for [her] children to be around and probably wouldn't work out in [her] best interest." However, the record contains no information justifying concerns about respondent having a paramour or associating with unsavory people. At the March 14, 2024, permanency review hearing, the caseworker reported she had once done a background check on respondent's then-fiancé and could not recall there being any concerns. According to a report submitted in advance of the April 18, 2024, permanency review hearing, respondent and her fiancé recently separated, and respondent was not dating anybody. If there was any other cause for concern about respondent's associates, the reasons are not reflected in the record.

¶ 58 Accordingly, even assuming respondent was not quite yet dispositionally fit on April 18, 2024, the inescapable conclusion from the record is that respondent was well on her way to fitness. Respondent made significant strides to address all barriers to returning the minors to her care. The trial court's finding that respondent failed to make reasonable progress was against the manifest weight of the evidence.

¶ 59 This leads into respondent's contention that the trial court erroneously and prematurely terminated wardship. Terminating wardship and closing a case is warranted where the "health, safety, and the best interests of the minor and the public no longer require the wardship of the court." 705 ILCS 405/2-31(2) (West 2022). When determining best interests, the court must consider the following factors, "in the context of the child's age and developmental needs":

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

> (h) the uniqueness of every family and child;

> (i) the risks attendant to entering and being in substitute care; and

> (j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

¶ 60　　　The trial court terminated wardship and closed the case because respondent was making "reasonable efforts but the progress isn't necessarily matching up," the minors had "achieved permanency at this stage with [Cameron] in his home," and respondent remained unfit. The court and the attorneys also believed the court would have authority to modify its final order sometime in the future upon respondent filing some sort of petition. On that last point, the court told respondent: "I am going to retain jurisdiction over this, so if you get yourself to a point where you get that sobriety in, you can petition the Court again for your fitness to be returned and then that can happen." The court reiterated respondent could "repetition" the court if she "show[ed] a time of sobriety" and distanced herself from unspecified people.

¶ 61　　　We hold the trial court abused its discretion in terminating wardship and closing the case. As explained above, the finding that respondent failed to make reasonable progress was against the manifest weight of the evidence. Moreover, the court's decision to terminate wardship and close the case was based in part on a mistake of law. See *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 99 (2006) (explaining that a court abuses its discretion if it applies improper criteria when weighing facts). As we detailed above, contrary to what the court and the attorneys anticipated, there is no statutory mechanism for respondent to petition the court to modify the final judgment entered on April 18, 2024, based on her subsequent progress.

¶ 62　　　Moreover, when Cameron asked the trial court whether respondent was allowed to see the minors after the order terminating wardship, the court discouraged such contact.

Discouraging respondent's contact with the minors plainly was not in the minors' best interests. Respondent made substantial progress toward addressing the problems that brought the case into care, and she was rapidly approaching a point where the court could return the minors to her custody without judicial oversight. Cameron wanted to facilitate the minors' relationship with respondent, and there were never any concerns raised about respondent's interactions with the minors after the commencement of the case. If the court harbored any doubts about respondent's long-term sobriety due to her one relapse three months earlier, the court should have given her an additional opportunity to prove herself. We discern no conceivable benefit to either the minors or the public in terminating wardship at this juncture and closing the case with a finding that respondent remained dispositionally unfit, with no way to legally change that status.

¶ 63 Thus, the order entered on April 18, 2024, constituted an abuse of discretion, and we reverse it. We remand this case to the trial court with directions to reopen the case, reinstate wardship, and set permanency reviews at such reasonable intervals as to reassess the best interests of the minors consistent with this opinion.

¶ 64                                III. CONCLUSION

¶ 65 For the reasons stated, we reverse the trial court's judgment and remand the case for further proceedings to include the reinstatement of wardship and permanency reviews at reasonable intervals.

¶ 66 Reversed and remanded with directions.

**_In re D.V._, 2024 IL App (4th) 240751**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Tazewell County, Nos. 23-JA-124, 23-JA-125; the Hon. Timothy J. Cusack, Judge, presiding. |
| **Attorneys for Appellant:** | Louis P. Milot, of Peoria, for appellant. |
| **Attorneys for Appellee:** | Kevin E. Johnson, State's Attorney, of Pekin (Patrick Delfino, David J. Robinson, and Courtney M. O'Connor, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |