NOTICE

Decision filed 04/03/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250903-U

NO. 5-25-0903

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* JOURNEE B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Piatt County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-JA-7 |
| | ) | |
| Travis B., | ) | Honorable |
| | ) | Dana C. Rhoades, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices McHaney and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's finding that the father was unable to exercise custody where the evidence supported that finding. However, we reverse the circuit court's order terminating the wardship and closing the case where the circuit court failed to make adequate factual findings concerning whether this disposition was in the child's best interest. We remand this matter to the circuit court to reopen the case and make appropriate findings.

¶ 2    The respondent, Travis B. (Father), appeals an order of the circuit court of Piatt County terminating the wardship of his daughter, closing the case, and placing custody of the child with her mother, Trinity Ba. (Mother).[1] He argues that (1) the circuit court abused its discretion in terminating the wardship and closing the case and (2) the circuit court's factual findings

_____

[1]Mother is not a party to this appeal.

1

concerning the child's best interest were inadequate. We affirm the circuit court's finding that Father remains unable to exercise custody. We otherwise reverse the circuit court's order and remand for further proceedings consistent with this decision.

¶ 3                                  I. BACKGROUND

¶ 4        When this case began, Father was incarcerated, and his minor daughter, Journee B. (born November 2018), lived with Mother and Mother's younger daughter, Kinslee Ba. (born May 2020).[2] On March 28, 2024, both children were taken into protective custody. On April 1, 2024, the State filed a petition for adjudication of neglect, alleging that Journee was neglected by virtue of being in an environment injurious to her welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2022)). Specifically, the petition alleged that Journee was exposed to substance abuse while residing with Mother. The circuit court entered a temporary custody order following a shelter care hearing the same day.

¶ 5        On June 13, 2024, Lutheran Children and Family Services (LCFS), the agency providing services to the family for the Department of Children and Family Services (DCFS), filed a dispositional report in advance of the adjudicatory and dispositional hearings. The report noted that although Father was not indicated in this case, he had two prior indicated findings of neglect.[3] The report included a section outlining Mother's self-reported social history. It noted that Mother alleged that while she was pregnant with Journee, Father was incarcerated on charges of domestic battery, theft, and home invasion. Mother further alleged that Father was physically violent to her, causing injuries such as broken bones, welts, and black eyes. The dispositional report contained a

---

[2]A separate case was opened involving Kinslee, which is not at issue in this appeal. We discuss matters involving Mother and Kinslee only to the extent they are relevant to the questions before us.

[3]The report states that one of these indicated findings occurred in December 2022. Due to a typographical error, the date of the second indicated report is unclear. However, a shelter care report filed by DCFS earlier in the case states that there was an indicated finding of neglect against Father in April 2022 involving allegations of an incident of domestic violence that occurred in Journee's presence.

2

list of Father's prior criminal convictions, including assault, burglary, obstruction of justice, obstructing the peace, sexual assault, and possession of a stolen vehicle. The report indicated that Father was in contact with LCFS and had shown "great interest in visiting with his child."

¶ 6 The circuit court held an adjudicatory hearing on June 17, 2024. Father appeared at the hearing *pro se*, having previously asked to represent himself. Mother stipulated to the allegation of neglect in the petition, and the circuit court made a finding of neglect based on her stipulation. The circuit court entered a written order that day, finding that Journee was neglected and that the neglect was inflicted by Mother.

¶ 7 The matter initially came for a dispositional hearing on July 29, 2024. Father again appeared *pro se*. During the hearing, however, he requested that the court again appoint counsel. The court proceeded to find that Mother was unfit and unable to exercise custody and that it was in the best interests of the child to be made a ward of the court. However, the court deferred making any dispositional findings as to Father due to his request for counsel. The court appointed counsel and continued the matter.

¶ 8 The dispositional hearing resumed on August 19, 2024. Father's attorney questioned the caseworker about the child's foster care placement, which was the only concern raised by Father. On the same day, the circuit court entered a dispositional order making Journee a ward of the court. The order contained the following dispositional findings: Mother was unfit and unable to care for the child, and Father was unable to care for the child. With respect to Father, the order stated, "Father is incarcerated in [the Illinois Department of Corrections] and needs services to address domestic violence and mental health issues. He is still in need of a complete Integrated Assessment."

3

¶ 9    The circuit court entered permanency orders on November 4, 2024; March 10, 2025; June 30, 2025; and September 8, 2025. In each order, the court set a goal of return home within 12 months and found that Father made reasonable efforts toward that goal but did not make reasonable and substantial progress. The June 30, 2025, permanency order stated that due to his incarceration, Father was unable to participate in some required services—specifically, services related to mental health and domestic violence. While the circuit court initially found that Mother failed to make either reasonable efforts or reasonable and substantial progress, in the June 30 and September 8, 2025, orders, the court found that she made both reasonable efforts and reasonable and substantial progress.

¶ 10    In October 2025 Father's attorney filed a motion to withdraw as counsel, alleging that Father refused to listen to her advice and contacted her office multiple times a day "in a harassing and threatening manner," resulting in "an irreconcilable breakdown in the attorney/client relationship." The circuit court granted counsel's motion, and Father entered a written appearance as a *pro se* litigant.

¶ 11    On October 24, 2025, LCFS filed a permanency report. The report outlined each parent's progress. Father had been released from prison on October 3, 2025. The report indicated that he was cooperating with the agency and his supervised visits with Journee were going well. Father provided activities and games to play with Journee during visits, and she appeared to enjoy spending time with him. The agency had no concerns with visitation at that time.

¶ 12    The report stated that Father had already completed a required anger management class, and he was fully engaged in a parenting class with a projected completion date of October 29, 2025. He had been scheduled for one drug screen since his recent release from prison, which came back negative for any illicit substances. However, Father was required to comply with additional

4

random drug screens. Regarding income, Father reported that he would begin a new job on October 28. As to housing, Father had space in a sober-living home. Because it was a shared living space, it could not pass a home safety inspection without background checks on all individuals living in the home.

¶ 13    The report noted that Mother, too, was cooperating with the agency. She had completed parenting classes, provided proof of a stable income, and was cooperating with random drug screens. Mother lived with her grandparents, whose home had passed a safety check. She had progressed to unsupervised overnight visits with her daughters, which were going well. Mother had completed 46.25 hours each of mental health counseling and substance abuse counseling; however, due to "a lapse in insurance," she stopped seeing her counselors in May 2025. She was working to find a new provider.[4]

¶ 14    In an assessment of the parents' progress, the report stated that Mother had made satisfactory progress toward the goal of returning the children to her care. Although Father was making reasonable progress toward that goal, LCFS would require drug screens "for a little longer to ensure there will be no issue" and would not allow him to have unsupervised visits with Journee until all the individuals residing in the sober-living home passed background checks. The agency recommended returning custody of both Journee and Kinslee to Mother. Although the agency did not specifically recommend either closing the case or keeping it open, it recommended a permanency goal of return home within 12 months.

¶ 15    Father filed three *pro se* pleadings in response. In a "Motion to Object to Consideration of Placement with Mother and Request Consideration of Placement with Father," he made various

---

[4]The record does not indicate how many hours of counseling Mother was recommended to complete for either mental health or substance abuse. An earlier permanency report, filed in August 2025 indicates that at that time, Mother was "on hold" for both types of therapy until her new insurance coverage began.

accusations, including allegations that Mother neglected the child's needs and undermined his relationship with the child. He further alleged that Mother's grandparents' home was an inappropriate placement, explaining that due to the grandparents' "health complications" placing children in their home would be a burden to them and "may not provide a stable environment." In addition, he asserted that he believed Mother was not actually living with her grandparents but instead used their address to obtain agency approval of her housing.

¶ 16    In a "Motion to Request Parenting Time," Father alleged, among other things, that he had a separate living area designated for his use and noted that he could have a lock installed. He further asserted that DCFS previously approved Oxford House, the shared sober-living house where he was staying, as a home for other residents' children. Finally, in a letter to the circuit judge, Father alleged that the agency did not provide him with adequate reunification services. He further alleged medical neglect of Journee and interference with his relationship with her by both Mother and Journee's foster mother. He requested that the court order counseling for Journee.

¶ 17    The matter came for a permanency hearing on November 4, 2025. The circuit court noted that it had considered the report filed by LCFS as well as the various *pro se* pleadings filed by Father. Asked if he wanted the court to consider anything else, Father indicated that he had counseling lined up for Journee if she were placed in his custody. The other parties did not present evidence or request consideration of anything other than the permanency report.

¶ 18    The State argued that Mother had made substantial progress, noting that she had completed most of her services and had remained sober for nearly one year. The State noted that Father, likewise, had been cooperative and had made progress, but because Father had been out of prison for "a relatively short amount of time," the degree of his progress was "hard to gauge." The State recommended returning custody to Mother and closing the case, explaining, "I think we do have a

6

fit and able parent. I think we have another one who is close." The State argued that there was no further need for DCFS involvement and that the appropriate venue for any further determinations was family court.

¶ 19    The guardian *ad litem* (GAL) concurred with the State's recommendation. Alternatively, he urged the court to require Father to undergo a psychological evaluation if the case remained open. He explained, "Given his history with prior counsel, Judge, and even given his communications with me, it's evident that there are some psychological issues with this gentleman." He did not elaborate on his own communications from Father that raised this concern.

¶ 20    Father argued that his greatest concern with returning custody to Mother was "parental alienation." He asserted that Mother and her family continued to "alienate" him from Journee. He stated that if he were given custody, he would not keep Journee away from Kinslee or Mother. In addition, Father reiterated his allegation that residing with Mother and her grandparents would not be a good placement due to the grandparents' health concerns. Finally, Father stated that he had a strong support system available.

¶ 21    Mother argued, through counsel, that Father's argument concerning Mother was based on facts not in evidence. She argued that the case should be closed because there was a fit parent ready and able to care for both children. She explained, "We don't keep cases open in juvenile court waiting and expecting that both parents be returned to fitness at the same time or different times."

¶ 22    Announcing its ruling from the bench, the circuit court first stated, "I do find that based on the information in the report that this is a great report for [Mother.] It's a good report for you too, [Father.]" The circuit court found that Mother made both reasonable efforts and reasonable and substantial progress and that she was now fit and willing and able to exercise custody of her children. As to Father, the circuit court found that he made "progress and reasonable efforts."

7

Addressing Father, the court explained that the issues he raised "would be more appropriately addressed in your family case that's in Champaign County." In conclusion, the circuit court ruled that the guardianship would be vacated, the case would be closed, and custody would be returned to Mother.

¶ 23     On the same date, the circuit court entered a written permanency order expressly finding that the goal of return home had been achieved. The court found that Mother made both reasonable efforts and reasonable and substantial progress. With respect to Father, the court checked boxes indicating that he, too, made both reasonable efforts and reasonable and substantial progress. In its written findings, however, the court stated as follows: "Father is making some progress, but given the relatively short time he has been out of [the Illinois Department of Corrections], he has not made substantial progress." The circuit court further found that "Father remains unable to exercise custody and guardianship of the minor" and that it was in the best interest of the child to restore custody to Mother. The order vacated the wardship and closed the case. This timely appeal followed.

¶ 24                                    II. ANALYSIS

¶ 25     On appeal, Father argues that (1) the circuit court abused its discretion in terminating the wardship and closing the case and (2) the circuit court's factual findings concerning the child's best interest were inadequate. We agree.

¶ 26     Under the Act, a circuit court may make a child a ward of the court if it determines that a parent is unfit or otherwise unable to care for the child for reasons other than financial circumstances alone. 705 ILCS 405/2-27(1) (West 2024). Once a child is made a ward of the court, the circuit court must determine a disposition that will best serve the health, safety, and interest of the child and the public. 705 ILCS 405/2-22(1) (West 2024). There are multiple dispositional

8

options available. The circuit court may continue custody with the child's parent or parents, place the child in substitute care, restore custody to a parent, or order the child emancipated (if the child is old enough). 705 ILCS 405/2-23; 2-27 (West 2024). However, custody of a child found to be neglected or abused may not be restored to a parent until the circuit court determines that the parent is fit to care for the child. 705 ILCS 405/2-23(1)(a) (West 2024).

¶ 27 Once the circuit court enters a dispositional order making a child a ward of the court, the Act mandates periodic permanency hearings to review the original disposition. 705 ILCS 405/2-28 (West 2024). Permanency review hearings "are simply further dispositional hearings." *In re M.G.*, 2018 IL App (3d) 170591, ¶ 13. Significantly for purposes of this appeal, the circuit court may vacate the original dispositional order and enter any other dispositional order that would have been available initially. *In re M.G.*, 2018 IL App (3d) 170591, ¶ 13. The circuit court has the discretion to set permanency goals and to make a final decision regarding what placement option serves the best interests of the child. *In re V.M.*, 352 Ill. App. 3d 391, 397 (2004). Before it may terminate a wardship, however, the circuit court must follow certain statutory requirements. *In re Aaron R.*, 387 Ill. App. 3d 1130, 1139 (2009).

¶ 28 The Act requires the circuit court to make "written factual findings[ ] that the health, safety, and best interests of the minor and the public no longer require the wardship of the court." 705 ILCS 405/2-31(2) (West 2024). In addition, the circuit court must ensure compliance with section 2-28 of the Act (705 ILCS 405/2-28 (West 2024)), which provides that a child may not be returned to the custody of any parent unless the court determines that the child can be returned without endangering his or her health or safety and unless returning home is in the child's best interests. *In re Aaron R.*, 387 Ill. App. 3d at 1138-39 (citing 705 ILCS 405/2-28(4), 2-31(2) (West 2006)).

9

¶ 29    As with all other determinations involving the child's best interest, the circuit court must consider 10 statutory best interest factors. *In re D.V.*, 2024 IL App (4th) 240751, ¶ 59; *In re Aaron R.*, 387 Ill. App. 3d at 1138. Those factors are (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and familial, cultural, and religious ties; (4) the child's sense of attachment; (5) the child's wishes and long-term goals; (6) the child's ties to community, including school, church, and friends; (7) the need for permanence, including continuity in the child's relationships with siblings, parental figures, and other family members; (8) the uniqueness of each family and child; (9) the risks involved in substitute care; and (10) the preferences of people available to care for the child. 705 ILCS 405/1-3(4.05) (West 2024).

¶ 30    Generally, we review a circuit court's decision to terminate the wardship under the manifest-weight-of-the-evidence standard if its weighing of the evidence is at issue, and we otherwise review the decision for an abuse of discretion. *In re D.V.*, 2024 IL App (4th) 240751, ¶ 52; *In re Aaron R.*, 387 Ill. App. 3d at 1141. However, whether the circuit court complied with the statutory requirements is a question of law subject to *de novo* review. *In re Aaron R.*, 387 Ill. App. 3d at 1138 (citing *In re Jaime P.*, 223 Ill. 2d 526, 532 (2006)).

¶ 31    Father first argues that the circuit court abused its discretion in terminating the wardship and closing the case. We agree, although we reach this conclusion for reasons different from those advanced by Father.

¶ 32    There are two components to Father's abuse-of-discretion argument. First, although he does not frame his argument in terms of the manifest weight of the evidence, he contends that the circuit court gave no basis to substantiate the finding that he was not willing, fit, or able to care for the child "other than the length of time he had been released." As such, he contends, "there was

no evidence to support the decision to restore custody and guardianship to Mother only." We disagree.

¶ 33 Father correctly points out that he was never found unfit; he was only found unable to care for the child and exercise custody. He asserts, however, that his incarceration was the only reason for this finding and that, as such, once he was released from prison, he "corrected the condition that required DCFS to obtain custody and guardianship of the child." We believe this statement mischaracterizes the record. The dispositional order found that Father was incarcerated and needed to complete services. That dispositional finding was not changed in any of the permanency review orders. At the time of the final permanency hearing, undisputed evidence established that while Father was cooperating with the agency and engaging in services, he still had services to complete, and he had not yet progressed to unsupervised visitation with the child due to the need to complete background checks on all individuals residing at Oxford House. Thus, the evidence supported the circuit court's findings that Father made reasonable efforts but was still unable to exercise custody.

¶ 34 We likewise believe the evidence supported the circuit court's finding that Mother was fit and able to exercise custody. The permanency report considered by the circuit court established that she had complied with all services, remained sober for over one year, and corrected the conditions in her home environment that brought the child into care. We therefore conclude that the evidence supports the circuit court's decision to restore custody to Mother alone.

¶ 35 The second component of Father's abuse-of-discretion argument is a contention that the decision to end the wardship and close the case constituted an abuse of the circuit court's discretion because it left him "dispositionally unable to exercise custody or guardianship of his child" with no means of changing this status or additional time to complete services. We agree.

11

¶ 36    Generally, a circuit court abuses its discretion only if its decision is arbitrary or unreasonable, such that no reasonable person would agree with its determination. *In re D.V.*, 2024 IL App (4th) 240751, ¶ 52. However, a decision based on a mistake of law likewise constitutes an abuse of discretion. *In re D.V.*, 2024 IL App (4th) 240751, ¶ 61.

¶ 37    Here, the circuit court did not give any consideration to the option of returning the child to Mother's custody while leaving the wardship in place to allow Father time to complete additional services necessary to be found fit and able to parent his child. Instead, it accepted the argument of the State, the GAL, and Mother that once one parent is found fit and able to exercise custody, further DCFS involvement is unnecessary and "[w]e don't keep cases open in juvenile court" until both parents are found fit. Contrary to the parties' contention, however, circuit courts have the authority to return a child to the custody of a fit parent while continuing to exercise supervisory authority over the other parent. *In re S.S.*, 313 Ill. App. 3d 121, 133 (2000). Because the decision in this case was therefore based, in part, on a mistake of law, it constitutes an abuse of discretion.

¶ 38    Father next contends that the circuit court's findings concerning whether terminating the wardship serves the child's best interest were inadequate. We agree.

¶ 39    In this regard, we find our recent decision in *In re Miracle H.*, 2025 IL App (5th) 250034-U instructive.[5] There, as here, the circuit court held a permanency hearing after which it found that placing the child in the respondent mother's custody was appropriate. *In re Miracle H.*, 2025 IL App (5th) 250034-U, ¶ 18. The circuit court then considered three options with respect to the respondent father: finding that he, too, was fit and able to exercise custody; continuing the wardship to give him an opportunity to be restored to fitness; or closing the wardship without

---

[5]We cite *In re Miracle H.* as persuasive authority in accordance with Illinois Supreme Court Rule 23(e)(1) (eff. June 3, 2025).

12

finding that the father was fit. *In re Miracle H.*, 2025 IL App (5th) 250034-U, ¶ 18. Reasoning that the child's interest in stability and permanence outweighed her interest in having two fit parents, the court found that the father remained unfit, vacated the wardship, and closed the case. *In re Miracle H.*, 2025 IL App (5th) 250034-U, ¶¶ 18-19. In reaching this decision, the circuit court also found that the child's relationship with her father would not be impeded if he were not restored to fitness. *In re Miracle H.*, 2025 IL App (5th) 250034-U, ¶ 18.

¶ 40    On appeal, the father argued that the circuit court's findings were against the manifest weight of the evidence and that its decision to terminate the wardship was not in the child's best interest. *In re Miracle H.*, 2025 IL App (5th) 250034-U, ¶ 21. This court rejected the father's argument concerning the circuit court's finding that he was not yet fit, concluding that this finding was supported by the evidence. *In re Miracle H.*, 2025 IL App (5th) 250034-U, ¶ 27.

¶ 41    We then turned our attention to the circuit court's best interest findings. We noted that the record in that case indicated that the father had a strong bond with his child, provided appropriate care during his unsupervised visits with her, often agreed to spend more time with her than was scheduled, was engaged in services, and "had a positive report from his counselor." *In re Miracle H.*, 2025 IL App (5th) 250034-U, ¶¶ 28-29. We observed that, despite this evidence, the circuit court's decision would terminate the father's services, a fact the circuit court did not address. *In re Miracle H.*, 2025 IL App (5th) 250034-U, ¶ 29. In addition, we found it significant that the circuit court placed heavy weight on the child's need for permanence without considering any other statutory best interest factors. *In re Miracle H.*, 2025 IL App (5th) 250034-U, ¶ 29. We concluded that its findings were thus inadequate to comply with the requirements of section 2-31(2) of the Act (705 ILCS 405/2-31(2) (West 2024)). *In re Miracle H.*, 2025 IL App (5th) 250034-U, ¶ 30.

¶ 42    The circuit court's findings in the instant case were even more limited than the findings at issue in *In re Miracle H.*, 2025 IL App (5th) 250034-U. In its written permanency order, the circuit court checked a box on a form order indicating that additional orders were unnecessary and another box indicating that it was in the best interest of the child "to restore custody to the parent(s)/guardian/legal custodian" because she could now be cared for at home without endangering her health, safety or welfare. The second finding was amended through interlineation to state that it was in the child's best interest "to restore custody to the parent Trinity [Ba.]." These findings do not expressly address the question of whether terminating the wardship—thus ending services for Father—was in the child's best interest.

¶ 43    Moreover, there is no indication that the circuit court considered any of the statutory factors. We recognize that circuit courts are not required to refer to each individual factor in rendering their decisions. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. Here, however, the circuit court did not mention that it considered the statutory factors, nor did the circuit court allude to any factual matters related to those factors in either the written order or its oral pronouncement. Notably, the circuit court did not address Journee's best interest at all in its oral ruling, and none of the parties addressed the question in their arguments at the final permanency review hearing.

¶ 44    Given Father's positive interactions with his daughter and his demonstrated commitment to engaging with services, the circuit court must at least consider whether continuing the wardship and leaving the case open would be in the child's best interest rather than automatically closing the case because one parent has been found fit and "we don't wait for both parents to be fit." Its failure to consider this option in accordance with the best interest factors was woefully inadequate to comport with the statutory requirements. We must therefore reverse the circuit court's ruling

14

and remand this matter to the circuit court with directions to reopen the case and make these determinations.

¶ 45    Finally, we note that, although we have found that the evidence supported the circuit court's finding that Father remained unable to exercise custody of Journee, its findings concerning his progress toward the goal of reunification were contradictory and confusing. As discussed above, the written permanency order contained a finding that Father made "reasonable and substantial progress" followed immediately by a finding that he made reasonable efforts and "some progress," but had not yet made "reasonable progress." The circuit court did not clarify the matter in its oral pronouncement, where it simply found that Father made "progress," without specifying whether that progress was "reasonable." On remand, the circuit court should clarify these findings in addition to making the requisite findings as to Journee's best interest.

¶ 46                                III. CONCLUSION

¶ 47    For the foregoing reasons, we affirm the circuit court's determination that Father remained unable to exercise custody; however, we reverse the portions of the order terminating the wardship and closing the case. We remand this cause with directions to reopen the case and hold further proceedings consistent with this order.


¶ 48    Affirmed in part; reversed in part; remanded with directions.

15