NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 241017-U

NO. 4-24-1017

IN THE APPELLATE COURT

FILED
December 16, 2024
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* A.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Lee County |
| Petitioner-Appellee, | ) | No. 20JA29 |
| v. | ) | |
| Lonisha M. | ) | Honorable |
| Respondent-Appellant). | ) | Theresa M. Friel-Draper, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding the trial court's determination that it was in the minor's best interest to restore custody to the minor's father and close the case was not against the manifest weight of the evidence.

¶ 2    Respondent, Lonisha M., appeals the trial court's order restoring guardianship of her son, A.M. (born in 2015), to his father, Ronald R., and closing the juvenile case. She argues that the court's determination that such actions were in A.M.'s best interest was against the manifest weight of the evidence.

¶ 3    We disagree and affirm.

¶ 4                                I. BACKGROUND

¶ 5    On August 4, 2020, the State filed a petition for adjudication of wardship of A.M., alleging he was neglected due to an environment injurious to his welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)). The

petition specifically alleged that respondent had two prior indicated reports from February and June 2020 and had violated family service recommendations by testing positive for alcohol and marijuana on July 29, 2020. The petition also alleged A.M. and his younger brother, An. M., witnessed a physical altercation between respondent and a neighbor. The petition listed Ronald R. as A.M.'s alleged father and stated his whereabouts were unknown. At a hearing the same day, the trial court found probable cause to believe A.M. was neglected and granted temporary custody to the guardianship administrator of the Illinois Department of Children and Family Services (DCFS).

¶ 6        In an order dated October 19, 2020, the trial court returned A.M. home to respondent and continued the case under court supervision. In a dispositional order entered a few days later, the court stated that respondent had stipulated to the allegations in the State's petition and that no finding of neglect would be entered at that time. Instead, the order stated A.M. would remain with respondent and she would continue to participate in substance abuse treatment and individual therapy, complete a parenting education program, cooperate with DCFS and Lutheran Social Services of Illinois (LSSI), and comply with random drug screenings.

¶ 7        At a hearing on November 23, 2020, the State again sought temporary custody of A.M., alleging that respondent, while intoxicated, had a physical altercation with A.M.'s maternal grandmother while A.M. was present. The altercation involved the use of a knife and resulted in injuries to the involved parties. The trial court found there existed an immediate and urgent necessity to remove A.M. from respondent's home, as remaining there was contrary to his best interest, safety, or welfare. Temporary custody was again granted to DCFS.

¶ 8        On January 5, 2021, the State filed a petition alleging respondent failed to comply with the terms of the October 2020 dispositional order by failing to cooperate with DCFS and LSSI and continuing to consume alcohol. On January 24, 2022, respondent stipulated to these

allegations, and the trial court adjudicated A.M. neglected. In a dispositional order dated April 11, 2022, A.M. was made a ward of the court. The dispositional order also held Ronald, A.M.'s alleged father, in default. The State had previously filed an affidavit stating that, after a diligent search, he could not be located.

¶ 9        On March 13, 2023, the State filed a petition for termination of parental rights. The petition alleged that both respondent and Ronald were unfit pursuant to section (1)(D)(a),(b),(m)(i)-(ii),(n) of the Adoption Act for (1) failing to maintain a reasonable degree of interest, concern, or responsibility as to A.M.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) failing to make reasonable progress toward the return of the minor during any nine-month period following the adjudication of neglect, with the relevant period designated as April 11, 2022, through January 11, 2023 (*id.* § 1(D)(m)(ii)); and (3) failing to make reasonable efforts to correct the conditions which were the basis for the removal of A.M. during the same nine-month period (*id.* § 1(D)(m)(i)). The petition additionally alleged Ronald was unfit for (1) abandoning A.M. (*id.* § 1(D)(a) and (2) demonstrating his intent to forgo his parental rights, as manifested by his failure for a period of twelve months to visit the minor, communicate with the minor or DCFS, or plan for the future of the minor, although physically able to do so (*id.* § 1(D)(n).

¶ 10        On May 1, 2023, Ronald, who resided in Texas, appeared in court for the first time. He stated he was not aware he had a child but wished to assume responsibility for A.M. He was advised to cooperate with DCFS and comply with the terms of his service plan or risk termination of his parental rights. A DNA test later confirmed that Ronald was A.M.'s biological father. On July 17, 2023, an order was entered establishing his paternity.

¶ 11        In a permanency order dated November 6, 2023, the trial court found Ronald made reasonable and substantial progress and efforts toward returning A.M. home, but respondent did

not. The court set a permanency goal of returning A.M. home within 12 months. In a May 6, 2024, permanency order, the court changed the permanency goal to return home within five months. Ronald was again found to have made reasonable efforts and progress. Respondent was found to have made reasonable efforts, but not reasonable progress.

¶ 12    On July 15, 2024, the trial court held another permanency hearing. Danielle Griffin, a caseworker with LSSI, testified that respondent was not engaged in substance abuse treatment, failed to appear for three drug tests, and refused to sign releases to allow caseworkers to access her healthcare records, despite being repeatedly asked to do so. She testified that respondent initially visited with A.M. and his brother every two weeks, but the visits became irregular because, as Griffin stated, "I would have to just talk to [respondent] week to week to see how her mood would be for that week, if it would be, you know, safe for myself or the kids to be in her presence." She stated that phone conversations with respondent had also become hostile after, Griffin believed, respondent's family began telling her "some things," possibly related to the relationships between her children and their biological fathers. Griffin confirmed that A.M. was fostered with Cletus, his maternal uncle.

¶ 13    Griffin testified to a letter she received from A.M.'s therapist in preparation for court. The therapist believed respondent was a "trigger" for A.M. and A.M.'s behavior became out of control when she supervised him.

¶ 14    Griffin testified that she completed federal background checks for Ronald and his girlfriend, which did not raise any concerns. Ronald had no family services left to complete and had sought local accommodations in his hometown for A.M., including schooling, psychiatry, counseling, and pediatrics. Ronald had also moved into a new home in which A.M. would have his own bedroom. Griffin confirmed she saw the home via video call and performed a virtual walk-

through to ensure it was safe. She recalled that video calls between Ronald and A.M. had been going well but that Ronald was having increasing difficulty reaching A.M. due to intervention on the part of A.M.'s foster parent, Cletus. Griffin stated that the foster parents for both brothers had stopped supporting the visitation plans with the children's respective fathers and, on one occasion, respondent mentioned kidnapping her children and taking them to another state. Still, Ronald attempted to call A.M. regularly and had two in-person meetings with him, which Griffin stated were positive experiences. She stated that A.M. told her he wanted to return to Texas with his father. When asked if she believed anything was preventing A.M.'s return home to Ronald, she answered no.

¶ 15 Tricia Patterson, the trial court appointed special advocate (CASA) for A.M., recounted a visit between respondent and the two brothers at a park. Shortly after their arrival, while the family was still in their van, A.M. had a "meltdown" and attempted to hit respondent and his brother and choke himself. Although he eventually got out of the van and played with his brother on the playground, the visit continued to deteriorate when respondent became upset about a caseworker chastising A.M. for improperly using the playground equipment. The caseworker attempted to end the visit, and respondent refused. Law enforcement was called, with Patterson explaining:

> "I don't know if we would have been able to get the kids in the van safely because [respondent] would—she would be mad and then she'd be fine and then she'd be mad. So I think it was just more cautionary to keep the kids safe and be able to get them transported out of there safely."

Patterson stated she had never seen a visit go so poorly with a parent in her time as a CASA. She recommended that A.M. be returned to his father.

¶ 16       Respondent then testified on her own behalf. She stated it was false that she was not involved in any substance abuse programs. She testified that she attended an appointment at a treatment center at the beginning of the month and had another scheduled in a few days. She confirmed, on the State's questioning, that her upcoming appointment was to "redo intake." She acknowledged missing her last three drug screenings, but stated it was due to her caseworker texting a phone number she did not regularly use. She denied not signing release forms for the caseworker and stated her willingness to sign any forms she had possibly missed. She believed she acted appropriately at the visit to the park with her children and denied telling Griffin she would take her children out-of-state. She stated her willingness to take a urinalysis that day and stated it "should be" clean. She confirmed that she wanted her sons to return home to her, adding that A.M. "does not want to be with his dad in Texas. He cries about it."

¶ 17       The State recommended that the goal be set to return A.M. home to his father. Although counsel found it "concerning" that the trial court would lose oversight of A.M.'s case due to Ronald residing in another state, she noted that Ronald had a plan for schooling, doctor's appointments, and psychiatric treatment for A.M., leading her to conclude that placement with him would be appropriate.

¶ 18       Counsel for Ronald argued for returning A.M. to Ronald's care. Counsel stated, "I understand that this is in Texas and we'll no longer be able to monitor or stay over this case. I have never seen someone put forth the effort he has ***. I think it's absolutely clear that he is the best option for placement at this point."

¶ 19       Respondent's attorney objected to the return of the children to their fathers and asked the trial court to find respondent had made reasonable progress and efforts toward returning the minors home.

¶ 20       In addition to the testimony of witnesses and arguments of counsel, the trial court also considered two LSSI reports, a DCFS permanency report, two DCFS service plans, and a CASA report in making its determination. One of the LSSI reports disclosed that Texas had denied Ronald's Interstate Compact on the Placement of Children (ICPC) request to place A.M. with him and supervise the case due to Ronald's criminal background. Specifically, Ronald was convicted of sexual assault of a child in 1997 for having sex with a 14-year-old girl when he was 19. He reported he believed the girl to be 17. Moreover, in 1999, he was arrested for failing to register as a sex offender and for injury to a child. He reported that these charges stemmed from an incident in which the young daughter of his girlfriend at the time found and applied perming lotion to her body while Ronald was in the shower. Not being familiar with perming lotion, Ronald washed the child with a type of soap that exacerbated the chemical effect of the lotion and resulted in burns over the child's body. He served 14 years in connection with these offenses. The LSSI report noted that the results of a lie detector test provided by Ronald showed no deception on his part. The report also stated that Ronald had completed a psychosexual assessment and all recommended services while incarcerated. Despite the denial of the ICPC, the LSSI report requested A.M.'s return home to Ronald.

¶ 21       The CASA report also recommended custody and guardianship of A.M. to go to Ronald and for the case to be closed.

¶ 22       The DCFS service plan noted that A.M. struggled with misconduct in school and at the local Boys and Girls Club, resulting in suspension and expulsion. He was diagnosed with disruptive mood disorder and attention-deficit/hyperactivity disorder, for which he took medication. The plan stated respondent was unsatisfactory in completion of services in the following areas: cooperation with DCFS, recognition of the impact of family violence, and

participation in mental health and substance abuse services. However, she was rated satisfactory with respect to parenting. Ronald was rated satisfactory in his cooperation with DCFS. In a separate DCFS permanency report, Ronald was additionally reported to have completed services for domestic violence and parenting.

¶ 23　　　　The trial court found that respondent had made reasonable efforts toward the return of the minors, but not reasonable progress. Ronald was found to have made both reasonable efforts and progress. The court found that he was fit to care for A.M., that his home was safe and appropriate, that he had made reasonable and appropriate plans for A.M.'s transition into his care, and that he had completed all services and requests made by the agency and the court to enable it to find that residing with him was in A.M.'s best interest. The court ordered DCFS's guardianship and custody of A.M. to be discharged and the case closed. In an accompanying written order, the court granted custody and guardianship to Ronald.

¶ 24　　　　This appeal followed.

¶ 25　　　　　　　　　　　　　II. ANALYSIS

¶ 26　　　　On appeal, respondent argues that it was not in A.M.'s best interest to restore custody to Ronald and close the case. She specifically argues that it was not in A.M.'s best interest to place him with Ronald where (1) further court supervision would not be possible due to Ronald's location, (2) there was no evidence presented that Ronald would foster a relationship between A.M. and An. M., who was placed with his own biological father, and (3) the State did not provide sufficient evidence to prove that Ronald "was equipped to handle all of [A.M.'s] emotional and behavioral needs."

¶ 27　　　　The Act sets forth the process by which a minor is made a ward of the court. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1068 (2009). First, the trial court must hold an adjudicatory hearing

to determine if the minor is abused, neglected, or dependent. *Id.*; 705 ILCS 405/2-21(1) (West 2022). If it finds the minor to be abused, neglected, or dependent, the court must then hold a dispositional hearing to decide if it is in the minor's best interest to be made a ward of the court. *Jay. H.*, Ill. App. 3d at 1068. Once a child is made a ward of the court, the court gains the authority to determine the proper placement of the minor. 705 ILCS 405/2-22(1) (West 2022). The court must hold regular permanency hearings to determine the future status of the child. *Id.* § 2-28(2).

¶ 28        A trial court may terminate wardship and close a minor's case where it determines "that the health, safety, and the best interests of the minor and the public no longer require the wardship of the court." *Id.* § 2-31. When making any best-interest determination under the Act, a court must consider the following factors, "in the context of the child's age and developmental needs:"

> "(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;
>
> (b) the development of the child's identity;
>
> (c) the child's background and ties, including familial, cultural, and religious;
>
> (d) the child's sense of attachments, including:
>
> > (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);
> >
> > (ii) the child's sense of security;
> >
> > (iii) the child's sense of familiarity;
> >
> > (iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child."

*Id.* § 1-3(4.05)(a)-(j).

When a court terminates wardship, it may also terminate or continue the minor's current custody and guardianship in accordance with section 2-28 of the Act. *Id.* § 2-31. Section 2-28 provides that a court may restore a minor to a parent previously adjudicated unfit if (1) the parent has subsequently been found fit and (2) it is in the best interest of the minor to grant the parent custody and guardianship. *Id.* § 2-28(1). A court's decision as to what placement is in a child's best interest will only be reversed if it is against the manifest weight of the evidence. *In re M.K.*, 271 Ill. App. 3d 820, 831 (1995). Likewise, "[a] trial court's determination to terminate wardship is reviewed under the manifest-weight-of-the-evidence standard when the court's weighing of facts is at issue; otherwise, it is reviewed for abuse of discretion." (Internal quotation marks omitted.) *In re D.V.*, 2024 IL App (4th) 240751, ¶ 52 (quoting *In re Aaron R.*, 387 Ill. App. 3d 1130, 1141 (2009)). A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *Id.* ¶ 52. A court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable. *Id.*

¶ 29 Respondent first argues that placing A.M. with his father out-of-state without any oversight was not in A.M.'s best interest where LSSI had previously sought to transfer the case to an agency in Texas for supervision. Respondent asserts that, because of LSSI's action, the trial court cannot find that closing the case and ceasing court supervision was in A.M.'s best interest.

¶ 30 We disagree. LSSI's ICPC request was a matter completely separate from the trial court's decision to place A.M. with his father and close the case; the court did not require the referral, nor was its decision dependent on its results. The question before the court was simply whether placing A.M. with his father and closing the case was in his best interest, which we discuss more fully below. Although Ronald's criminal history, which served as the basis of the ICPC denial, was a relevant factor in making that determination, the fact that LSSI separately made an ICPC request for supervision from a Texas agency is not in itself determinative. We further note that a report made by LSSI after Ronald's ICPC request was denied still recommended that A.M. be returned home to him, even without court supervision.

¶ 31 Respondent also argues that placing A.M. with Ronald was not in A.M.'s best interest where (1) no evidence was presented at the permanency hearing that Ronald would foster a relationship between A.M. and his brother and (2) Ronald was not equipped to handle A.M.'s emotional and behavioral needs. We note that in arguing the importance of A.M.'s relationship with his sibling to the trial court's best-interest determination, respondent relies on section 2-28(2) of the Act, which contains best-interest factors to be considered when a court selects a temporary permanency goal for a minor. 705 ILCS 405/2-28(2) (West 2022). We do not believe this section supports respondent's argument, as it does not appear respondent contests the court's last permanency goal of returning A.M. home within five months. Instead, she challenges the court's decision to close the case and place A.M. immediately and finally in Ronald's care. See *In re*

- 11 -

*Tasha L.-I.*, 383 Ill. App. 3d 45, 51-52 (2008) (using the best-interest factors under section 1-3(4.05) of the Act to analyze a court's decision to terminate wardship and restore custody to a minor's parents, not the factors under section 2-28). Regardless, in determining whether it was in A.M.'s best interest to close his case and place him with his father, the court was obligated to consider the best-interest factors set forth in section 1-3(4.05), which also includes the consideration of a minor's familial ties. 705 ILCS 405/1-3(4.05)(c) (West 2022). Therefore, respondent's argument remains applicable.

¶ 32        While no evidence was presented that Ronald would continue to foster a relationship between A.M. and his brother, An. M., if the two were placed in different states, A.M.'s relationship with his brother is only one consideration the trial court must have weighed in determining whether placement with Ronald was in A.M.'s best interest. Further, section 1-3(4.05) requires a court to consider not only sibling relationships, but familial relationships, generally, when deciding a minor's best interest. *Id.* The court could very well have determined that, after all the factors were considered, A.M. would be best served by placement with his biological father, even if that made it difficult to maintain a relationship with his brother to the same degree as he had previously. We are therefore unconvinced by this argument.

¶ 33        We also disagree with respondent's assertion that Ronald was not equipped to handle A.M.'s behavioral needs. On the contrary, the evidence showed that Ronald had already taken steps to accommodate A.M.'s emotional needs by establishing a counselor and psychiatrist for the minor in Texas. Although respondent catalogs her son's emotional and behavioral struggles, she does not suggest what more Ronald could do to address those issues or what more might be offered by an alternative placement.

¶ 34        The evidence presented overwhelmingly supported the trial court's determination

that it was in A.M.'s best interest to place him with his father. From the time he learned of his paternity, Ronald put his full effort into gaining custody of A.M. He fully complied with the requirements of the service plan created by DCFS and moved into a safe home where A.M. would have his own bedroom. He established services in his hometown to meet A.M.'s behavioral, physical, mental, and educational needs and, from the outset, he expressed a desire to be in A.M.'s life, a sentiment that A.M. reciprocated. Importantly, a placement with Ronald would provide A.M. with an opportunity for permanence with a parent, a stated goal of the Act. *Id.* § 1-2(1). We therefore do not find the court's determination that it was in A.M.'s best interest to be placed with Ronald to be against the manifest weight of the evidence.

¶ 35        Respondent makes a fleeting argument that the trial court should have restored guardianship and custody to her instead of Ronald. However, the court could not have done so, as it determined respondent failed to make reasonable progress toward the return of A.M. to her home and therefore remained unfit. See *Id.* § 2-28(1) (stating custody cannot be restored to a parent adjudicated unfit until the court determines she has regained her fitness). Furthermore, even if the court could have placed A.M. with respondent, the evidence does not suggest doing so would be in his best interest. Respondent was noncompliant with various requirements of her service plan. Her relationship with A.M. was fraught, and A.M.'s psychiatrist stated that A.M. acted out when under her care. Visits between the two had become less frequent due to the unpredictability of respondent's moods. Further, despite respondent's assertions that she was seeking substance abuse treatment, testimony showed she had failed to appear at multiple drug screenings and appeared to be intoxicated at An. M.'s birthday party.

¶ 36        The trial court found that placing A.M. with Ronald was in the minor's best interest. We do not find the evidence before us compels the opposite conclusion. Similarly, given that A.M.

was placed in the custody of a parent who, by all evidence presented, was willing and able to provide him with a safe, loving home where his needs could be met, we do not find the court's decision to close A.M.'s case and terminate his wardship to be an abuse of discretion.

¶ 37                                    III. CONCLUSION

¶ 38          For the reasons stated, we affirm the trial court's judgment.

¶ 39          Affirmed.