NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250271-U

NO. 4-25-0271

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 5, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re M.H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 23JA203 |
| v. | ) | |
| Samantha R., | ) | Honorable |
| Respondent-Appellant). | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Zenoff and Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed the trial court's termination of wardship over M.H. but vacated its subsequent order barring visitation between M.H. and respondent.

¶ 2     Respondent, Samantha R., appeals the trial court's order terminating its wardship over her son, M.H., and ordering no contact between respondent and M.H. until further order of the court. She raises two arguments on appeal. First, she argues the court erred in entering the order barring contact with her son where (1) she was not given advance notice that the order would be entered and was denied the opportunity to present evidence, (2) the order contained no specified duration, and (3) the order had an insufficient basis. Second, she argues the court erred in terminating M.H.'s wardship where doing so was (1) premature, (2) contrary to the best interest of the minor, and (3) not in adherence with the requirements of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2024)).

¶ 3        We affirm in part and vacate in part.

¶ 4                    I. BACKGROUND

¶ 5        On November 8, 2023, a petition for adjudication of wardship was filed for M.H, alleging that he was a neglected minor pursuant to section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2022)). The petition alleged that on or about June 26, 2023, the Illinois Department of Children and Family Services (DCFS) received a hotline call stating that M.H. had a bruise on the side of his face, a bite mark on his right shoulder, and a mark on his lower back. The same day, a DCFS investigator spoke with M.H. at the home of his father, Ryan H. At the time, M.H. alternated between living with Ryan H. and respondent. M.H. told the investigator that he had earlier attempted to run away from respondent's home after a confrontation between the two, and respondent had grabbed him, forced his right arm into his mouth making it difficult to breathe, and slapped his face multiple times. The investigator viewed a short video of the incident taken by one of M.H.'s siblings in which M.H.'s feet appeared to be off the ground, with respondent's arm around his neck. M.H. stated that respondent and her boyfriend, Joel C., often became upset with him and his siblings and would yell, curse, "spank them, pop them in the mouth and slap them when they [were] angry." M.H. stated that he felt safe living with his father, but not respondent. M.H.'s siblings and other family members confirmed the violence and drug use in respondent's home.

¶ 6        On September 5, 2023, Ryan H. died from the combined toxic effects of fentanyl and clonazepam. M.H. was present at the time his father was found deceased. M.H. began living with Susan H., his paternal grandmother. She filed an emergency petition for guardianship. The court ordered the guardianship matter stayed while the juvenile case progressed. On November 22, 2023, Susan H. entered her appearance in the juvenile case, and on December 14, 2023, she filed

an answer to the petition for adjudication of wardship.

¶ 7    On January 24, 2024, the trial court entered an order of no contact, barring respondent from having any communication with M.H. or Susan H. except via supervised parenting time at the discretion of DCFS. This order was entered pursuant to section 2-25 of the Act (705 ILCS 405/2-25 (West 2024)) and was to remain in effect until further order of the court. It is unclear from the record when, if at all, this order was reviewed, extended, or terminated.

¶ 8    On October 16, 2024, an adjudicatory hearing was held, and based on the allegations in the petition, the trial court found that M.H. was a neglected minor in that his environment was injurious to his welfare. See *id.* § 2-3(1)(b). The court further found that respondent was responsible for the neglect. A dispositional hearing was held immediately after the adjudicatory hearing. The court found Susan H. was fit, able, and willing to care for M.H. and that respondent was unfit. M.H. was made a ward of the court and custody was placed with Susan H. Respondent was admonished that she must comply with the terms of her service plan and correct the conditions that required the minor to be in Susan H.'s care or risk termination of her parental rights. In a supplemental task order, she was ordered to, among other things, cooperate with DCFS, obtain and maintain stable housing, complete a substance abuse assessment and any recommended treatment, engage in individual and family counseling as recommended by M.H.'s counselor, complete a domestic violence class, and submit to random testing for drugs and alcohol twice a month. The court ordered no visitation between M.H. and respondent until deemed appropriate by M.H.'s counselor.

¶ 9    Respondent appealed the trial court's finding of dispositional unfitness. We affirmed. See *In re M.H.*, 2025 IL App (4th) 241472-U, ¶ 3.

¶ 10    On March 5, 2025, the trial court held the first permanency review for M.H. A

report was filed with the court by Jessica Siadek, M.H.'s caseworker. According to the report, respondent admitted fault for M.H.'s removal from her care. But while she was generally cooperative in completing the ordered services, she remained combative with the agency and displayed a negative attitude. The agency remained concerned that she was merely checking boxes in completing services rather than applying the knowledge she learned. From January 8, 2025, to February 11, 2025, respondent completed four drug drops, all of which were negative. At the time the report was created, the results of two more recent drug drops were still pending.

¶ 11 The report further stated that Susan H. provided a warm, stable home for M.H. and that her residence was free of clutter or safety concerns. M.H. informed the caseworker that he was safe and happy at his grandmother's house and no longer worried about his younger brother, A.H., because A.H. had been removed from respondent's care and placed with a foster family. M.H. had recently transferred to a new school, which presented a positive change. He made the honor roll for the first time and received in-person counseling through a program at the school called Final Four. He also attended regular counseling at the Child Advocacy Center (CAC) in Pekin, Illinois. Susan H. told the caseworker that M.H. worked with his CAC counselor to minimize his triggers. According to Susan H., his biggest concern was running into his mother in public. The report stated that M.H. voiced a strong desire to remain in his grandmother's home.

¶ 12 The report concluded by recommending that respondent continue to be found unfit and be ordered to attend additional anger management classes. We note that the trial court referenced other reports throughout the hearing and in its decision, yet these reports are seemingly not included in the record on appeal.

¶ 13 At the hearing, respondent proffered that she was willing and able to complete any services the agency asked.

¶ 14        The guardian *ad litem* (GAL) informed the court that, in the past, M.H. was apprehensive before visits with respondent, but he would be "very loving and affectionate" toward her during the visit itself. When the GAL questioned M.H. about the discrepancy in his behavior before and during visits, M.H. responded that if he did not act happy at the visits, respondent would "do to [A.H.] what she did to me." The GAL stated, "[T]his has been a consistent thing that he has said to me when I have spoke with him over the multiple times that I've seen him." The GAL went on to say that Susan H. was committed to M.H., and he was not concerned about M.H.'s care with her.

¶ 15        The State recommended that M.H.'s case be closed and he remain placed with his grandmother. Counsel for Susan H. echoed this recommendation, noting that Susan H. indicated she would continue with M.H.'s counseling, even if he were not a ward of the court and could not be compelled to attend. Counsel for respondent argued that respondent was fit but unable to care for M.H., emphasizing that respondent had negative drug drops and was in mental health counseling. In addressing respondent's combative behavior with the agency, counsel explained that losing one's children is an important matter and respondent was merely passionate and frustrated with the process of getting them back. The GAL repeated the belief that respondent was checking boxes in her services but failing to make actual progress.

¶ 16        Based on the testimony and reports provided, the court found respondent had made reasonable efforts in completing her services, but there was no reasonable progress, and she remained unfit. The court specifically found that respondent was completing services but not implementing the knowledge she gained, was combative with the agency, and appeared to have an "ego problem." The court recounted incidents in which respondent appeared at the same place M.H. was, knowing he would be there, after being ordered to have no contact with him. The court

found this "extremely concerning." The court stated that, upon seeing his mother, M.H. "ducked down as if to hunker down and started to breathe heavy. He placed his head in his hands to cover his face which is very clearly a trauma response." These incidents appear to have been documented in a report that was not included in the record on appeal.

¶ 17    The court continued that M.H. remained severely traumatized by respondent's actions and, because of this trauma, he could not be placed with her any time in the near future. It found that M.H. had achieved permanency living with his grandmother and was making positive changes at his new school.

¶ 18    The court granted the State's request to terminate wardship of M.H. and continue custody and guardianship with Susan H. After the court gave its decision, the GAL asked that, since the court "still [had] jurisdiction over [respondent]," there be a "continued no contact order" between respondent and M.H. pending further order of the court. The court granted the request, over the objection of respondent's counsel. The court stated:

> "I do think that it's very clear that [M.H.] has extreme responses, negative responses to seeing mom.
>
> His terror of even seeing her out in public even *** in light of considering how the case even came to care, the awful things that he had to endure, I can understand it's gonna be quite some time before he's processed that to be in a better place to lift that.
>
> So that will be until further order of the court. Mom is still gonna be here on—so that can be revisited later if need be."

¶ 19    This appeal followed.

¶ 20                                    II. ANALYSIS

¶ 21                          A. Termination of Wardship

¶ 22          Respondent argues that the trial court's decision to terminate wardship over M.H. was "premature, did not adhere to the requirements of the [Act] and was contrary to the best interest of the minor."

¶ 23          To begin, respondent's argument that the court's decision to terminate wardship over M.H. was "premature" has no merit. The Act does not require that a certain time period elapse prior to the termination of wardship. See 705 ILCS 405/2-31(2) (West 2024). Rather, wardship must be terminated "whenever the court determines *** that health, safety, and the best interests of the minor and the public no longer require the wardship of the court." *Id.* As long as those statutory requirements are met, a termination of wardship cannot be said to be "premature." Respondent cites *In re M.K.*, 271 Ill. App. 3d 820 (1995), for the proposition that trial courts have been reversed for "short circuit[ing] the normal process and not afford[ing] the parent a reasonable opportunity to make reasonable efforts and reasonable progress when it deems it is in the minor's best interest." However, in *M.K.*, we clearly stated that consideration of a parent's reasonable progress was irrelevant when determining if wardship termination was proper because the appropriate standard for termination of wardship was the child's best interest, not the parent's reasonable progress. *Id.* at 832. Although we found the trial court abused its discretion in terminating wardship over the minor in that case, that finding had nothing to do with the amount of time the parent was given to make reasonable progress. *Id.* at 831. It was instead based on the fact that closing the minor's case would remove the ability of the court to order further counseling, which we deemed essential to the minor's best interest. *Id.* We therefore find respondent's reliance on this case uncompelling.

¶ 24          Respondent also argues that the trial court did not "adhere to the requirements of

the [Act]" in terminating M.H.'s wardship. She discusses section 2-28(2.3)(C) of the Act at length (705 ILCS 405/2-28(2.3)(C) (West 2024)), which contains the factors a court must consider when switching the permanency goal of a ward of the court to a non-return home goal. She argues these factors were not considered by the trial court here.

¶ 25   We find section 2-28(2.3)(C) inapplicable to the situation at hand, as the court here did not set a permanency goal for M.H. but instead terminated its wardship of him. Respondent maintains that the court's termination of wardship acted as a "*de facto* non-return home guardianship goal to a private individual," but we disagree. While the court continued M.H.'s placement with his grandmother, pursuant to terminating his wardship under section 2-31(2) (see *id.* § 2-31(2) (allowing a court to continue guardianship at the same time it terminates wardship)), it did not set a future permanency goal that would remain open for later review under section 2-28(2.3)(C). To that end, respondent does not appear to contest the court's specific placement of M.H. with Susan H. She argues only that the court did not consider the factors contained in section 2-28(2.3)(C) in making this decision. Because these factors apply to setting a permanency goal, not closing a case, we find them inapplicable to the present situation.

¶ 26   Respondent also argues the trial court's decision to terminate wardship over M.H. was not in the minor's best interest because she had completed the majority of her ordered services and "was on her way to fitness." She claims the court did not discuss the best interest factors contained in section 1-3(4.05) of the Act (*id.* § 1-3(405)) and,

> "apart from exaggerated and laudatory comments about how well M.H. is doing in the paternal grandmother's care and M.H.'s dated statement to the [GAL] that he did not want to live at home with [respondent], there [was] no substantive exploration as to what would truly be in M.H.'s best interest."

¶ 27    When determining a child's best interest under the Act, a court "must evaluate the minor's physical safety and welfare, the development of his identity, his background and ties, his sense of attachments, his wishes and long-term goals, his community ties, his need for permanence, and the preferences of the persons available to care for him." *In re Aaron R.*, 387 Ill. App. 3d 1130, 1138 (2009); see 705 ILCS 405/1-3(4.05) (West 2024). A court's termination of wardship is reviewed under a manifest-weight-of-the-evidence standard when the court's weighing of facts is at issue. *In re D.V.*, 2024 IL App (4th) 240751, ¶ 52. A judgment is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 28    We first note the deficiency of the record on appeal. As stated, the trial court here appeared to reference multiple reports concerning M.H. at the permanency hearing, yet the record on appeal contained only one caseworker report, dated February 26, 2024. The burden is on the appellant to provide a sufficiently complete record on appeal, and in the absence of such a record, it will be presumed that the trial court's orders had a sufficient factual basis and were in conformity with the law. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Any doubts arising from the incompleteness of the record will be construed against the appellant, in this case, respondent. *Id.* at 392. Therefore, we will assume the missing records adequately established the court's finding that respondent, on multiple occasions, violated her no contact order with M.H., causing him psychological distress.

¶ 29    Regardless, even setting aside the evidence contained in the missing reports, we find there was sufficient evidence included in the record to support the trial court's decision to terminate wardship. The report dated February 26, 2024, established that M.H. was doing well in his placement with Susan H., was excelling in school, and was attending counseling. According to the GAL's statements at the hearing, Susan H. was committed to M.H., and there were no concerns

for him in her care. Counsel for Susan H. confirmed that if M.H.'s wardship were terminated, she would continue with his counseling. Additionally, M.H. repeatedly expressed a desire not to live with or have contact with respondent and showed apprehension when forced to visit her. Indeed, the caseworker's report noted Susan H.'s statement that one of M.H.'s largest struggles was the fear that he would encounter his mother in public. Moreover, although respondent completed some of her recommended services and tested negative on the drug tests she took, both the GAL and the agency expressed the belief that she was merely checking boxes, without applying the knowledge she learned.

¶ 30    From this evidence, the trial court found that respondent had failed to make reasonable progress, that M.H. remained traumatized from his experiences with her, and that he had achieved permanency with his grandmother and was thriving in her care. We do not find these conclusions, nor the resulting decision to terminate M.H.'s wardship, to be against the manifest weight of the evidence. Although respondent argues that the transcript from the March 5, 2024, hearing showed "little or no discussion" of the best interest factors contained in section 1-3(4.05), we disagree. The court clearly discussed M.H.'s physical safety, his wishes, his community ties, and his need for permanence. Yet, more to the point, while a court must consider each best interest factor when making a best interest determination, it need not reference each factor explicitly in its holding. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 31                               B. No Contact Order

¶ 32    Respondent also argues the trial court erred in barring her from any contact with M.H. because (1) she was not informed this condition would be permanently imposed and therefore did not have the opportunity to present evidence against its imposition, (2) there was an insufficient basis for the order, and (3) the order was of an indefinite duration. These arguments

are based on the procedural requirements of section 2-25 of the Act, which governs orders of protection entered in conjunction with juvenile proceedings. See 705 ILCS 405/2-25 (West 2024).

¶ 33    In contrast, the State argues the no contact order in this case was not entered pursuant to section 2-25 but was instead entered pursuant to section 2-23(3), which directs a trial court to enter "any other orders necessary to fulfill the service plan, including, but not limited to, ***(ii) restraining orders controlling the conduct of any party likely to frustrate the achievement of the goal, and (iii) visiting orders" at the time of entering a dispositional order. *Id.* § 2-23(3). The State argues that, because the order was entered pursuant to 2-23(3), respondent's arguments concerning the requirements of section 2-25 are inapplicable.

¶ 34    We note that the trial court here did not state what section of the Act it was ordering no contact pursuant to, either at the permanency hearing or in its written order terminating wardship. From the record, it appears that on January 24, 2024, the court entered an "order of no contact," ordering that respondent not have any communication with Susan H. or M.H., except for supervised visitation at DCFS's discretion. This order, which was entered before M.H. was made a ward of the court, specified that it was entered pursuant to section 2-25. On October 16, 2024, the court entered a dispositional order, after making M.H. a ward of the court, that stated there was to be no visitation between respondent and M.H. until further order of the court. Presumably, this removal of visitation was done pursuant to section 2-23, which allows a court to enter restraining or visiting orders in conjunction with a dispositional order as necessary to fulfill a minor's service plan. See *id.* At the next hearing, the final permanency hearing on March 5, 2025, the GAL requested that there be a "continued no contact order between [respondent] and [M.H.] pending further order of the court." The GAL suggested that this order could be entered because, despite M.H.'s case closing, the court "still [had] jurisdiction over [respondent]." The court granted the

request, telling respondent, "Mom is still gonna be here on—so that can be revisited later if need be."

¶ 35 Looking at the procedural history of this case, the GAL's characterization of the requested order as a "*continued*" no contact order, and the fact that the original section 2-25 order of protection did not prohibit *all* contact between respondent and M.H., but instead allowed for supervised visitation at the discretion of DCFS, we find it likely that, in entering the order of no contact at the March 2025 permanency hearing, the trial court sought to extend its prior dispositional order barring visitation between respondent and M.H. pursuant section 2-23(3) of the Act and did not intend to enter an order of protection under section 2-25. We will therefore examine the court's authority to enter such an order under section 2-23.

¶ 36 Section 2-23 of the Act lists different kinds of dispositional orders that may be made "in respect of wards of the court." *Id.* § 2-23(1) It also provides that, at the same time it enters a dispositional order, the trial court must enter any other orders necessary to fulfill the service plan, including "restraining orders controlling the conduct of any party likely to frustrate the achievement of the goal, and *** visiting orders." *Id.* at 2-23(3). The State appears to argue that the order in question here is one such restraining order. However, by the clear language of section 2-23, "[d]ispositional decisions, *such as visitation orders*, findings of unfitness, and determinations of guardianship are statutorily predicated upon the court first making the minors wards of the court." (Emphasis added.) *In re C.L.*, 384 Ill. App. 3d 689, 697 (2008). Where, as here, the minor in question has had his wardship terminated, the court lacks authority to enter a restraining/visitation order pursuant to section 2-23 of the Act. *Id.* (finding a visitation order exceeded court's authority where it was entered after the minors' cases were closed). The State cites *In re Taylor B.*, 359 Ill. App. 3d 647, 651 (2005), which discusses a court's authority to limit

contact between a parent and a minor pursuant to section 2-23.. However, we do not dispute that this authority exists; we only assert that it may not be exercised over a minor whose wardship has been terminated and whose case has been closed.

¶ 37 From the trial court's statements at the permanency hearing, it appears that it sought to retain jurisdiction over M.H.'s case due to M.H.'s sibling, A.H., remaining a ward of the court in a separate juvenile matter. This was improper. Although respondent would again appear before the court at A.H.'s next permanency hearing, the mere fact of the court having an opportunity to monitor her in a separate case does not allow it to enter orders pursuant to section 2-23 in the closed case of a separate child. See *C.L.*, 384 Ill. App. 3d at 697 (stating an order of visitation entered by the court after it closed a minor's case was unenforceable, even where the respondent mother's other children remained wards of the court).

¶ 38 Dispositional orders that are not authorized by statute are void and must be vacated. *Id.* We therefore conclude that the trial court's order barring contact between respondent and M.H. after it had closed M.H.'s case must be vacated.

¶ 39 III. CONCLUSION

¶ 40 For the reasons stated, we affirm the trial court's termination of wardship of M.H. and vacate its no contact order prohibiting contact between respondent and M.H.

¶ 41 Affirmed in part and vacated in part.