NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 250755-U

NO. 4-25-0755

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 2, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.T., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
|     Petitioner-Appellee, | ) | No. 23JA257 |
|     v. | ) | |
| Dashaina W., | ) | Honorable |
|     Respondent-Appellant). | ) | David A. Brown, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held:* The appellate court concluded that the trial court's decision to terminate the wardship of the minor at issue in this case was not against the manifest weight of the evidence.

¶ 2    Respondent, Dashaina W., is the mother of A.T. (born January 2023). In November 2023, the State filed a petition alleging A.T. was a neglected minor pursuant to section 2-3(1)(a)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a)(b) (West 2022)).

¶ 3    In November 2023, the trial court placed temporary custody and guardianship of A.T. with the guardian administrator of the Illinois Department of Children and Family Services (DCFS) and also entered a protective order requiring A.T. to reside with her father, Dammion T., and prohibiting respondent from having unsupervised contact with A.T. In March 2024, the trial

court adjudicated A.T. a ward of the court, placed custody and guardianship of A.T. with Dammion, and found respondent unfit due to medical neglect and domestic violence.

¶ 4　　　　　In July 2025, the trial court found that wardship was no longer in A.T.'s best interests and the closure of the case was appropriate. The court confirmed that respondent remained unfit, Dammion remained fit, and permanency had been achieved with Dammion as A.T.'s sole guardian and custodian.

¶ 5　　　　　Respondent appeals, arguing the trial court erred when it (1) terminated A.T.'s wardship and closed the juvenile case, finding wardship was no longer in the child's best interests, and (2) entered a permanency order that failed to comply with the statutory written-finding requirement. We affirm.

¶ 6　　　　　　　　　　　I. BACKGROUND

¶ 7　　　　　　　　A. The Neglect Petition and Temporary Custody Order

¶ 8　　　　　In November 2023, the State filed a petition alleging that A.T. was a neglected minor pursuant to section 2-3(1)(a)(b) of the Act (705 ILCS 405/2-3(1)(a)(b) (West 2022)). The petition alleged A.T. was neglected because she was not receiving the care necessary for her well-being due to respondent's medical neglect. Specifically, the petition alleged that A.T. was hospitalized twice due to respondent's failure to properly care for her severe eczema. The petition also alleged that during both hospitalizations, respondent initiated physical altercations with Dammion. The State also requested an order (1) directing that A.T. reside with her father, (2) prohibiting respondent from residing with A.T., and (3) limiting respondent's contact with A.T. to DCFS-supervised visits.

¶ 9　　　　　Later that month, following a hearing, the trial court entered an order finding probable cause to believe the allegations in the State's neglect petition were true. The court

ordered both parents to cooperate with DCFS and also entered an order of protection, which provided that (1) A.T. was to reside with Dammion, (2) respondent was prohibited from being present in the minor's residence, and (3) respondent was to have no contact with A.T. unless it was directly supervised by DCFS or its designee.

¶ 10    B. The March 2024 Adjudicatory Hearing and Dispositional Hearing

¶ 11    In March 2024, the trial court conducted an adjudicatory hearing, which was immediately followed by a dispositional hearing.

¶ 12    1. *The Adjudicatory Hearing*

¶ 13    At the outset of the adjudicatory hearing, the parties stipulated to the allegations in the State's neglect petition. The State then provided the following factual basis for the stipulations:

> "[F]or Count 1(a)(1)—for Count 1(a) in general, I would proffer several medical records from Carle Health, OSF, and Loyola Hospital. The Carle Health medical records would establish August 28th of 2023[,] the minor was admitted to Carle Health. Severe eczema were noted on the minor's face, and the minor had high fever. The minor was later transferred to OSF for escalation of care, and due to her getting worse, the child was later transferred to Loyola Hospital about September 5th of last year. And the child was discharged from Loyola for three days with detailed instructions.
>
> And in [the] August admission by Carle Health, the medical records established the child had possible nutritional deficiency, and the mother—the medical records noted the mother didn't feed the child with sufficient solid foods, only milk through the bottle. And Carle Health medical record also reflect that

- 3 -

when the medical staff was discussing with mother about the possible feeding, and the mother was looking at her phone, and the treating doctor noted there were concerns.

For Count 1(a)(2) I would proffer the DCFS investigator, Katrina Dickerson (phonetic), she spoke with respondent father on about October 6th of last year, and the father reported that when the child was admitted to the hospital, he came to visit and had argument with respondent mother and [she] ended up breaking his phone.

For Count 1(b)(1) I would proffer the medical records from OSF. The child was admitted to OSF in October 6th about last year by the respondent father, and respondent father would testify for three days before the mother dropped off the child without giving him further information on how to take care of the child's skin. And the father would also testify they were fighting about the custody.

For Count 1(b)(2) I would proffer the medical records from OSF to show the child's detailed medical conditions.

For Count 1(b)(3) I would proffer the OSF medical records. Medical record would reflect on October 8th of 2023[,] the nurses were hearing the arguments from the minor's room, and they were observe the minor's sheets and the pillows were covered with blood. When the nurse Ms. McNile (phonetic) was looking into that, she observed the arm splints and other equipment were removed. And she educated the mother, but the mother didn't respond at that point.

For Count 1(b)(4) I would proffer the minor's medical records from OSF.

October 8th of 2023, the notating nurses heard arguments from the patient's room, and the respondent father requested removing the mother. And the police—Peoria Police Officer Steven Miller responded, and several OSF security officers responded. They spoke with the father. He reported the details, what happened, and the—basically, the father took the respondent mother, threw the phone on the ground, and threw his glasses—no—sorry. Excuse me—threw his glasses on the ground and struck him in the face, and respondent mother was removed from the room.

For count 1(b)(5) the medical record would reflect the mother came back after the October 8th of 2023 incident. She was not allowed in, and she tried to discharge the minor. She was asked to leave the hospital as the DCFS open investigation."

¶ 14 The trial court accepted the State's proffer and found an adequate factual basis for the parents' stipulations. The court then found the State had met its burden of proof, determining that the material allegations in the petition were true and that A.T. was a neglected minor subject to an environment injurious to her welfare due to medical neglect and domestic violence.

¶ 15 *2. The Dispositional Hearing*

¶ 16 Immediately thereafter, the trial court then conducted a dispositional hearing, at which it considered, among other things, a dispositional report filed ahead of the March 7, 2024, hearing.

¶ 17 The report detailed new incidents involving respondent on December 23, 2023. On that day, respondent, accompanied by a police officer and others, went to Dammion's residence and claimed she was entitled to take A.T., despite a court order limiting her to

supervised contact. The officer, unaware of the court order, instructed the paternal grandmother to release A.T. to respondent. When respondent returned A.T. later that day, she allegedly assaulted the grandmother as she was holding A.T. This incident resulted in an indicated finding against respondent for creating a substantial risk of physical injury and an environment injurious to A.T.'s health.

¶ 18    Later that same day, respondent, her sister, and others went to Dammion's workplace and became involved in another physical altercation. During the incident, respondent threw a cup of ice at Dammion and jumped behind the counter to fight him. Respondent was later arrested for domestic battery as a result.

¶ 19    The report also noted that although respondent maintained appropriate housing, part-time employment, and communication with DCFS, she had not yet completed a required mental health assessment. She began anger management classes and parenting classes on February 21, 2024. Her supervised visits, conducted initially at the DCFS office and later at her home, were reported as positive. The report stated Dammion was cooperative, employed full-time, and capable of meeting A.T.'s needs. A.T., who was residing with Damion, was thriving in his care, and her medical condition was under control.

¶ 20    After hearing the parties' recommendations, the trial court entered a written dispositional order (1) making A.T. a ward of the court, (2) finding respondent unfit for reasons other than financial circumstances alone to protect, care for, train, or discipline the minor, and (3) placing custody and guardianship of A.T. with Dammion, whom the court found fit.

¶ 21    The trial court ordered both parents to cooperate with DCFS, comply with their service plans, and correct the conditions requiring the child to be in care or risk the termination of their parental rights. The court also ordered that the existing order of protection, which

required respondent's visits to be supervised by DCFS, remain in place.

¶ 22    The trial court's dispositional order specifically required respondent to (1) submit to a mental health assessment and follow all recommendations, (2) successfully complete parenting, domestic violence, and anger management courses, (3) obtain and maintain stable, safe housing, (4) notify DCFS within three days of any change in address, phone number, or household members, (5) provide DCFS with information about new individuals who may affect the children, and (6) make her best efforts to obtain and maintain a legal source of income.

¶ 23    The trial court set a six-month permanency review hearing for September 5, 2024, stating the focus would be on respondent's "efforts and progress" and warning her that she did "not *** have an unlimited amount of time to make some changes."

¶ 24    C. The September 2024 Permanency Review Hearing and Order

¶ 25    In September 2024, the trial court conducted a permanency review hearing, at which it considered a DCFS report dated September 3, 2024, and police incident reports. The State had filed police reports documenting (1) respondent's arrest for the December 2023 domestic battery, (2) an April 2024 weapons citation, where she was found in possession of brass knuckles, and (3) an April 2024 runaway report for a family member.

¶ 26    The DCFS report noted that since the dispositional hearing, respondent completed a mental health assessment in May 2024, which resulted in no recommendations or referrals for mental health treatment. She began anger management classes in February 2024 and successfully completed the program in April 2024. She also began parenting classes in February 2024 and had since successfully completed them. However, respondent's attendance at domestic violence counseling, which began in June 2024, was inconsistent; the provider reported respondent had missed as many classes as she had attended and risked an unsuccessful discharge if she missed

another class.

¶ 27    The report described A.T., then one year old, as thriving in Dammion's care, with her eczema under control. Caseworkers observed that A.T. had a strong attachment to her father and affectionate interactions with him during visits. The caseworker who authored the report noted that respondent had improved her communication with Dammion and had completed parenting and anger management services, but she still needed to finish domestic violence services.

¶ 28    At the permanency review hearing, the State, the guardian *ad litem* (GAL), and respondent's attorney all recommended keeping the case open, while Dammion's attorney argued for immediate closure, expressing concern that respondent's missed appointments for her domestic violence class would result in her being kicked out. Dammion's attorney argued that Dammion and A.T. "should [not] have to wait" for that process.

¶ 29    Following the parties' recommendations, the trial court stated that DCFS and Dammion had made reasonable efforts. However, it characterized respondent's efforts as mixed but "overall reasonable." Despite Dammion's request to close the case, the court left the case open to monitor respondent's completion of the domestic violence program and avoidance of any further police contact. The court emphasized the case "should be all about *** making some changes," and the "biggest change" it wanted to see was respondent not continuing "to get into issues with the police." The court warned respondent that a child does not understand such events the way an adult does and stressed that the "trauma that's inflicted on them" is what matters, not excuses for the police encounters. Ultimately, in its written order, the court found Dammion remained fit and respondent remained unfit. The court ordered a permanency goal of "remain intact."

¶ 30    D. The February 2025 Permanency Review Hearing and Order

¶ 31    In February 2025, the trial court conducted a permanency review hearing, at which it considered a January 2025 DCFS report, testimony, and police reports dated October 22, 2024, and January 26, 2025.

¶ 32    The DCFS permanency report provided updates since the September 2024 permanency review hearing. The report noted respondent was employed by Amazon. In November 2024, she reported she was pregnant and wanted to regain fitness. In December, she informed the caseworker she had miscarried, but she remained intent on working toward regaining fitness.

¶ 33    The report also documented significant new legal issues. Respondent had a new arrest in October 2024 for domestic battery, criminal damage to property, and interference with reporting. A warrant was subsequently issued in December 2024 for her failure to appear. Furthermore, the probation department reported that a petition to revoke respondent's supervision (from a prior matter) had been filed in January 2024, alleging a subsequent arrest and unpaid fines.

¶ 34    Regarding respondent's progress in services, she was unsuccessfully discharged from her initial domestic violence program in September 2024 for multiple absences and rule violations. She was referred to a new six-month program at the Center for Prevention of Abuse, which she began attending weekly in December 2024. The new provider reported she had been cooperative, with no issues.

¶ 35    Dammion remained cooperative and had no recommended services; he transported A.T. to school, communicated with staff, and handled medical appointments. A.T. continued to reside with Dammion, was still thriving, and was up to date on her immunizations,

with no concerns noted at her November 2024 medical visit.

¶ 36      The January 2025 police report detailed an incident in which the police responded to a reported domestic dispute involving respondent. Her ex-boyfriend reported that she had taken his video game consoles after an argument. Officers observed both parties yelling at each other. The consoles were found in respondent's vehicle and returned. During the encounter, officers documented that respondent made suicidal statements, and emergency response services were called to meet with her.

¶ 37      The trial court found the "intact" permanency goal appropriate, determining that (1) the required services were appropriate and had been provided and (2) A.T.'s placement was necessary and appropriate to the service plan and goal. Over Dammion's request to close the case, the court kept the matter open to give respondent an opportunity to work toward restoring her fitness.

¶ 38           E. The July 2025 Permanency Review Hearing and Order

¶ 39      In July 2025, the trial court conducted the final permanency review hearing in this case, at which the court considered testimony, a July 2025 DCFS permanency report, and a police report dated July 9, 2025.

¶ 40      The DCFS report stated that respondent resided in a one-bedroom apartment, was employed, and maintained communication with the caseworker. The report stated respondent had completed all her services, including parenting classes (completed in February 2024), anger management services (completed in April 2024), and a 26-week domestic violence intervention program (completed in June 2025). Respondent had also attended two-hour supervised visits with A.T. at the DCFS office, which went well.

¶ 41      In its assessment, DCFS noted the case has been open since December 2023.

Dammion was cooperative, provided a "stable living environment," and ensured all A.T.'s needs were met. The report noted Dammion and respondent "have been getting along" and he had been updating her on A.T.'s schooling and medical needs.

¶ 42            Although the report noted that respondent had no new incidents involving law enforcement since October 2024, respondent was arrested for domestic battery on July 9, 2025, just two days before the hearing, which was set forth in the July 2025 police report the State filed. According to the report, on July 9, 2025, police officers responded to a disturbance involving respondent and her then-boyfriend, Carl Parker, at Parker's sister's house. Parker and an eyewitness reported that respondent pulled her car in front of the house and sprayed Parker with pepper spray. Recorded video from a doorbell security camera showed Parker running inside holding his face, with respondent later attempting to enter the home.

¶ 43            During the hearing, respondent testified that she had been in a relationship with Parker from February 2025 until the July 2025 incident. She acknowledged her caseworker was unaware of this relationship. Regarding the incident, respondent testified that she sprayed Parker in self-defense after he allegedly pushed and punched her. She also testified that she was pursuing an order of protection against Parker.

¶ 44            The State, GAL, and Dammion's attorney recommended that the case be closed and Dammion be made sole guardian. Conversely, respondent's counsel asked to keep the case open for one more reporting period, arguing respondent had done what she had been ordered to do and needed extra counseling to "turn the corner" on these issues.

¶ 45            The trial court ordered the case closed, finding that Dammion remained fit and respondent unfit. When doing so, the court stated the following:

"The Court would find that DCFS has made reasonable efforts. It's an

intact case with dad. No efforts findings are necessary for him, but he's done what's been asked of him.

Mom, I don't know that there's much I can or need to add, but just from a historical standpoint, there has been continued police contact and arrests due to violence among family members and/or household members or dating relationship people really for the last two years involving you. Every—almost every report that—and reporting period we have[ ]—even the couple of months leading up to the disposition, there were family fights and police being called. And services have been provided included anger management, domestic violence, counseling for two years, and we continue to have the same conduct.      And whose fault it is at this stage of the game as far as one particular altercation or interaction, whether it was the boyfriend's fault or mom's fault, it's really kind of beside the point at this stage of the game. It's the fact that we can't—you can't change your life so that this violence and police contact and arrests aren't a constant part of—or almost constant part of it. Services have been provided. Resources have been allocated that—and that keeps coming back up.

And so dad's fit. He's remained fit the whole time. The child is safe and secure with dad. Mom remains unfit. I believe dad's attorney has asked that the case be closed for the last ten months repeatedly at each review period, and it's been declined so that mom could finish up services and make some changes. She's finished up the services, but she hasn't made the changes.

I don't—it's not reasonable for me to project into the future that that's going to change at this point in time. We'll repeat some services. And it's

unfortunate. And it's not going to be convenient for dad or for [A.T.] that we close out the case with mom remaining unfit, but I think that's in the child's best interest.

Mom, you can continue on your journey to try to get this stuff sorted out, but I don't think it's in the public's best interest to continue to dedicate scarce resources that other families are in need of for a mom who's not willing to or able to make some changes and to eliminate domestic violence and violence from her life.

And so, I agree with the recommendation to close the case out today with guardianship and custody to dad. Mom remaining unfit."

¶ 46 Following the hearing, the trial court issued a permanency review order, finding that permanency had been achieved through intact services and it was in A.T.'s best interests to close the case. The court granted Dammion sole guardianship and custody of A.T. and ordered the wardship terminated and the case closed, finding that respondent remained unfit.

¶ 47 The trial court entered a written "Order For Case Closure & Termination of Wardship" (1) closing the cause because "the health, safety, and best interests of [A.T.] and the public no longer require[d]" A.T.'s wardship, (2) finding that respondent remained unfit, and (3) naming Dammion "sole guardian & custodian of [A.T.]"

¶ 48 This appeal followed.

¶ 49                                    II. ANALYSIS

¶ 50 Respondent appeals, arguing the trial court erred when it (1) terminated A.T.'s wardship and closed the juvenile case, finding wardship was no longer in A.T.'s best interests and (2) entered a permanency order that failed to comply with the statutory requirement that the

court make written findings supporting its conclusions. We affirm.

¶ 51                    A. Termination of Wardship and Closing the Case

¶ 52        Respondent asserts that the trial court erred by finding that the minor's best interests no longer required wardship and that this matter should not be closed. We disagree.

¶ 53                    1. *The Applicable Law and Standard of Review*

¶ 54        Section 2-31(2) of the Act provides the following regarding the termination of wardship:

> "Whenever the court determines, and makes written factual findings, that health, safety, and the best interests of the minor and the public no longer require the wardship of the court, the court shall order the wardship terminated and all proceedings under this Act respecting that minor finally closed and discharged. The court may at the same time continue or terminate any custodianship or guardianship theretofore ordered but the termination must be made in compliance with Section 2-28." 705 ILCS 405/2-31(2) (West 2024).

¶ 55        When determining a child's best interests under the Act, a trial court "must evaluate the minor's physical safety and welfare, the development of his identity, his background and ties, his sense of attachments, his wishes and long-term goals, his community ties, his need for permanence, and the preferences of the persons available to care for him." *In re Aaron R.*, 387 Ill. App. 3d 1130, 1138 (2009); see 705 ILCS 405/1-3(4.05) (West 2024).

¶ 56        "A court's termination of wardship is reviewed under a manifest-weight-of-the-evidence standard when the court's weighing of facts is at issue. [Citation.] A judgment is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *In re M.H.*, 2025 IL App (4th) 250271, ¶ 26.

¶ 57                                    2. *This Case*

¶ 58            Respondent argues that the trial court's finding that wardship was no longer required was against the manifest weight of the evidence. She asserts that the July 2025 DCFS report documented that she (1) had completed every ordered service, including a 26-week domestic-violence program, (2) had corrected her earlier visitation issues, and (3) was engaging appropriately with A.T. She also claims that the court placed too much reliance on the July 2025 incident days earlier between her and her boyfriend, which involved "competing accounts" of what occurred. According to respondent, this evidence made the opposite conclusion clearly apparent—namely, that A.T.'s best interests were served by continuing wardship.

¶ 59            Although respondent frames her argument as merely "a short period of ongoing wardship (at minimal burden) to verify whether [her] freshly completed services translated into lasting change," her argument ignores the record. The record shows that the trial court had already given respondent ample opportunity to regain fitness for the nearly two years since this case's inception in November 2023. All the while, Dammion had (1) provided a stable and safe household for A.T., (2) remained fit, and (3) required no services. In Dammion's care, A.T. was "thriving." Respondent, on the other hand, had consistently brought instability into A.T.'s life, as demonstrated by her repeated arrests and incidents of domestic violence.

¶ 60            To the extent that respondent argues that her "progress" in completing her services should postpone the case's closure, we emphatically reject this argument. "Progress" by "checking off the boxes" in a service plan is meaningless when a parent's underlying dangerous behavior remains unchanged. See *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 56 ("The point of requiring parents to attend classes and engage in services is *** so parents *apply* what they learn in their lives, in the real world, such that the court can be confident that the children will be safe

in their care." (Emphasis in original.)). Further, "consideration of a parent's reasonable progress [i]s irrelevant when determining if wardship termination was proper because the appropriate standard for termination of wardship [i]s the child's best interest, not the parent's reasonable progress." *M.H.*, 2025 IL App (4th) 250271, ¶ 22 (citing *In re M.K.*, 271 Ill. App. 3d 820, 831-32 (1995)).

¶ 61　　　　The evidence in this case strongly supports the trial court's decision to terminate A.T.'s wardship. The DCFS reports established that A.T. was thriving in her placement with Dammion, she attended preschool, she was a "happy toddler," and her severe eczema was under control. Dammion provided for all her needs, was getting along with respondent, and made sure to update respondent on A.T.'s education and medical needs.

¶ 62　　　　In stark contrast to A.T.'s stability with Dammion, the record shows that despite respondent's completion of services and ostensible cooperation, her behavior remained dangerously unchanged. The trial court was presented with a troubling and consistent pattern of misconduct that began before the case was even filed and continued until the very eve of the final hearing when, in July 2025—*after* she had completed her 26-week domestic violence program—respondent was arrested once again for domestic battery.

¶ 63　　　　From this evidence, the trial court reasonably concluded that respondent remained unfit and was unlikely to regain fitness or maintain stability within a reasonable amount of time. On the other hand, it is undisputed that A.T. had achieved permanency with Dammion and was flourishing in his care. We conclude that the court's resulting decision to terminate A.T.'s wardship was not against the manifest weight of the evidence.

¶ 64　　　　　B. Compliance With the Written-Finding Requirement of the Act

¶ 65　　　　Respondent also argues that we should remand this case with instructions for the

trial court to modify its July 2025 permanency review order. She contends that order failed to comply with section 2-28 of the Act (705 ILCS 405/2-28 (West 2024)) because, for the selected permanency goal of "CASE CLOSURE," the court merely repeated "CASE CLOSURE" in the "reasons" line instead of providing express written findings. The State concedes the written order did not strictly comply with the statute but argues that the court's detailed oral findings at the final permanency hearing, which explained its reasons for selecting the goal and ruling out preceding goals, were sufficient to satisfy the Act. We agree with the State.

¶ 66 Respondent cites *In re K.H.*, 313 Ill. App. 3d 675, 683 (2000), in support of her contention that we must remand the present case for strict compliance with section 2-28 of the Act, but she does not explain how that case requires remand on this record. The State argues that strict compliance is not necessary here, citing *In re S.E.*, 319 Ill. App. 3d 937, 944-45 (2001), which distinguished and clarified this court's decision in *K.H.*

¶ 67 In *S.E.*, we wrote the following:

"First, this case is distinguishable from *K.H.*, in that here, the basis for the trial court's decision is clearly shown by the court's lengthy finding and remarks on the record at the August 2000 hearing. *** Given that (1) the evidence of record was more than sufficient to support the court's decision and (2) the basis for that decision is ascertainable from the record, we hold that we need not remand this case for entry of more specific written findings.

Moreover, when the record provides an adequate basis for review of the trial court's ruling, the legislative intent underlying the writing requirement is not compromised by a decision not to remand. In light of the overwhelming volume of cases moving through the trial courts and the bare-bones support staff at the

- 17 -

disposal of those courts, a court's oral pronouncement of its ruling should be viewed as sufficient to comply with section 2-28(2) of the Act if (1) those pronouncements appear in the record and (2) they would constitute a sufficient statement of the court's findings if the court had turned to the court reporter and requested that its oral pronouncement be typed up and printed in the form of an order. In other words, so long as something exists in the record stating the basis for the court's determination, the writing requirement should be deemed satisfied, regardless of whether the 'writing' was prepared by the court reporter or the court's administrative staff.

In conclusion, we decline to remand respondent's cause for the entry of a written order in compliance with section 2-28(2) of the Act because the basis for the court's decision is readily ascertainable from the record." *Id.*

¶ 68 Here, just as in *S.E.*, the trial court provided a thorough and comprehensive oral explanation for the change in A.T.'s permanency goal to "CASE CLOSURE" at the final permanency review hearing (*supra* ¶ 45). In sum, the court described (1) an overall lack of progress on respondent's part, (2) respondent's continued police contact and arrests due to domestic violence, (3) respondent's domestic violence and anger issues, (4) Dammion's efforts and continued cooperation with DCFS, and (5) the best interests of A.T. Accordingly, we decline to remand this cause for the entry of a written order compliant with section 2-28(2.3) of the Act because the basis for the court's decision is readily ascertainable from the record.

¶ 69 III. CONCLUSION

¶ 70 For the reasons stated, we affirm the trial court's judgment.

¶ 71 Affirmed.